In re BORDEN CHEMICALS AND PLASTICS OPERATING LIMITED PARTNERSHIP, et al., Debtors.

BCP Liquidating LLC, as successor in interest to Borden Chemicals and Plastics Operating Limited Partnership, et al., Plaintiff,

v.

Bridgeline Gas Marketing, LLC., Defendant.

Bankruptcy No. 01–1268(PJW).
Adversary No. 03–52162.

United States Bankruptcy Court, D. Delaware.

Jan. 13, 2006.

Mark E. Felger, Jeffrey R. Waxman, Cozen O'Connor, Wilmington, DE, Stuart F. Clayton, Jr., Lamberth, Cifelli, Stokes & Stout, P.A., Atlanta, GA, for Plaintiff BCP Liquidating, LLC.

John F. Higgins, James Matthew Vaughn, Joshua W. Wolfshohl, Porter & Hedges, L.L.P., Houston, TX, David J. Baldwin, Elihu Ezekiel Allinson, III, Potter Anderson & Corroon, LLP, Wilmington, DE, for Defendant Bridgeline Gas Marketing, LLC.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion is with respect to Bridgeline Gas Marketing, LLC's ("Bridgeline")

motion (Doc. # 24) seeking summary judgment and dismissing the adversary proceeding commenced against it by BCP Liquidating, LLC ("BCP").[1] For the reasons set forth below, the motion will be granted.

## BACKGROUND

As of the Petition Date (defined below), Borden Chemicals and Plastics Operating Limited Partnership ("Borden") was the fifth largest North American manufacturer and marketer of PVC resins. One of the primary raw materials used in manufacturing the resins was natural gas. Since 1987, Texaco Natural Gas, Inc. ("Texaco") had been one of the major suppliers of natural gas to Borden.

On April 1, 1997, Borden entered into a new agreement with Texaco pursuant to which Texaco agreed to supply Borden with natural gas (the "Agreement"). Texaco notified Borden by letter on March 27, 2000 that it wanted to assign its duties under the Agreement to Bridgeline effective as of March 1, 2000. Borden accepted this assignment on October 23, 2000.

From March 2000 through December 2000, the parties performed the contract without incident. In December of 2000, Bridgeline became concerned about Borden's financial situation and requested adequate assurance of future performance as allowed by the Agreement. On December 21, 2000, the parties agreed by letter that Borden would make weekly prepayments for any gas it received beginning in January (the "Prepayment Agreement"). The

Prepayment Agreement also provided that a "true-up" would occur on February 2 to account for the difference between the actual delivery of gas and the scheduled deliveries provided for in the Prepayment Agreement.

On April 3, 2001 (the "Petition Date"), Borden and its related entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code").[2] On February 5, 2003, the Court confirmed the Debtors' third amended joint plan of reorganization (the "Plan"). Among other things, the Plan created BCP to liquidate the remaining assets of the Debtors and pursue all causes of action.

On March 27, 2003, BCP filed this complaint seeking to avoid and recover $12,366,260.61 in transfers made during the preference period pursuant to §§ 547 and 550. From the pleadings, it appears that BCP intends to withdraw the claims for all but two transfers that total $7,695,110.61 (Doc. # 23, p. 1). Of this amount, $7,283,596.80 is a transfer that was made on January 25, 2001 for gas provided during December 2000 (the "January Payment"). The remaining $411,513.81 is a transfer that was made on February 23, 2001 that was a "true up" for actual gas provided during January (the "February Payment" and, together with the January Payment, the "Payments").

In its motion for summary judgment, Bridgeline argues that the transfers are protected as settlement payments pursuant to § 546(e).[3] BCP asserts that there

---

1. In light of the Court's ruling, the Court need not address BCP's motion (Doc. # 22) that is styled as a motion for partial summary judgment.

2. Individual sections of the Bankruptcy Code will be cited herein as "§ ___". Section citations refer to the applicable law and do not reflect any changes or renumbering made un-

der the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

3. Bridgeline also argues that the payments are protected pursuant to § 547(c)(2); however, because of the ruling, the Court need not address this argument.

are still material issues in dispute and, therefore, that summary judgment is inappropriate.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[4] The moving party bears the initial responsibility of proving that no genuine issue of material fact is in dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (quoting FED. R. CIV. P. 56(e)). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, and must make all inferences in favor thereof. *E.g., Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■■■ "Section [ ] 546(e) of the Code provides forward contract merchants with a complete defense to avoidance claims brought by a Trustee." *Williams v. Morgan Stanley Capital Group Inc. (In re Olympic Natural Gas Co.)*, 294 F.3d 737, 740 (5th Cir.2002) (citing 11 U.S.C. § 546(e)). In pertinent part, § 546(e) provides that, "[n]otwithstanding section[ ] ... 547 ... of this title, the trustee may not avoid a transfer that is a ... settlement payment, as defined in section 101 ... of this title, made by or to a ... forward contract merchant ..., that is made before the commencement of the case ...." 11 U.S.C. § 546(e). To qualify for this protection, the transfer recipient must demonstrate that it is a "forward contract merchant" and that the transfer was a "settlement payment" as those terms are defined by the Code. *Olympic Natural Gas*, 294 F.3d at 740 (citing 11 U.S.C. § 546(e)).

■■ "The first step in statutory interpretation is to look to the plain language of the statute itself." *In re Loewen Group Int'l, Inc.*, 274 B.R. 427, 433 (Bankr.D.Del. 2002) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir.1998)). As relevant to this matter, the Code defines a forward contract merchant as a "person whose business consists in whole or in part of entering into forward contracts as or with merchants in a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right or interest which is presently or in the future becomes the subject of dealing in the forward contract trade." 11 U.S.C. § 101(26). In turn, a forward contract is defined as "a contract (other than a commodity contract) for the purchase, sale or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into ...." 11 U.S.C. § 101(25).

---

4. Federal Rule of Civil Procedure 56(c) is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.

Because it is central to the dispute as to whether § 546(e) applies to Bridgeline, the first issue that must be determined is whether the Agreement constitutes a forward contract. In making this determination, the Court must decipher the meaning of the parenthetical "other than a commodity contract." 11 U.S.C. § 101(25). *Olympic Natural Gas* is instructive in that the Trustee in that case argued, as BCP argues in this case, that based on this parenthetical a contract that called for actual delivery could not be a forward contract for Code purposes. *Olympic Natural Gas*, 294 F.3d at 741. In rejecting this argument, the Fifth Circuit noted that "courts in other circuits have repeatedly stated that one of the distinguishing characteristics of a forward contract is that the parties expect to make actual delivery." *Id.* (citing *Nagel v. ADM Investor Servs., Inc.*, 217 F.3d 436, 441 (7th Cir.2000)) (holding that when eventual delivery of commodity is reasonably assured, contract is a forward); *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 579 (9th Cir.1982) (stating that forward contract is "predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future"); *Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983, 990 (8th Cir. 1999) ("[I]t is the contemplation of physical delivery of the subject commodity that is the hallmark of an unregulated cash-forward contract.").

In addition, *Collier* provides guidance through its explanation that, "[g]enerally speaking, 'forward contracts' are contracts for the future purchase or sale of commodities that are not subject to the rules of a contract market or board of trade. Thus, the terms 'commodity contract' and 'forward contract,' taken together, seamlessly cover the entirety of transactions in the commodity and forward contract markets, whether exchange-traded, regulated, over-the-counter or private." 5 COLLIER ON BANKRUPTCY ¶ 556.02[2], at 556–5 (15th ed. rev.2002). In this regard, the Code defines "commodity contract" in § 761(4) to include futures contracts that are traded on exchanges.[5] Based on the foregoing, the Court agrees with the Fifth Circuit's holding that the "parenthetical reinforces the commonly-understood distinction between on- and off-exchange transactions, by clarifying that not all contracts with a delayed-delivery component are included within the definition of 'forward contract.' " *Olympic Natural Gas*, 294 F.3d at 741. Therefore, the fact that the Agreement contemplated delivery of natural gas is only consistent with a holding that it constitutes a forward contract.

The next issue in determining whether the Agreement fits the Code's definition of forward contract is whether natural gas constitutes a commodity. This Court believes that, at this point in time, it can hardly be questioned that natural gas is a commodity under the Code. *See, e.g.,*

5. In defining commodity contract, § 761(4) provides:

(A) with respect to a futures commission merchant, contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade;

(B) with respect to a foreign futures commission merchant, foreign future;

(C) with respect to a leverage transaction merchant, leverage transaction;

(D) with respect to a clearing organization, contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade that is cleared by such clearing organization, or commodity option traded on, or subject to the rules of, a contract market or board of trade that is cleared by such clearing organization; or

(E) with respect to a commodity options dealer, commodity option.

*Olympic Natural Gas*, 294 F.3d (assuming, without discussion, that natural gas is a commodity); *In re Mirant*, 310 B.R. 548, 565 (Bankr.N.D.Tex.2004) (stating that "natural gas is a 'commodity' . . . .").

The last component that Bridgeline must demonstrate as to whether the Agreement is a forward contract is that it had a maturity date greater than two days after the date on which the contract was entered. 11 U.S.C. § 101(25). This requirement is satisfied by the monthly nominations Borden was required to make under § 3(b). That section specifies that Borden had to make its monthly nominations "[o]n or before six business days prior to the month of delivery . . . ." (Doc. # 26, Ex. A, p. 3). Thus, all of the monthly nominations made by Borden matured beyond the two-day requirement provided by Code § 101(25).

Therefore, it is clear that the Agreement had a maturity date greater than two days. Based on the foregoing, Bridgeline submitted sufficient evidence demonstrating that the Agreement is a forward contract as that term is defined by the Code.

BCP did not present evidence that rebutted the above evidence supporting Bridgeline's position that the Agreement is a forward contract. BCP submitted the affidavit of Michael Fuqua ("Fuqua") in an attempt to rebut Bridgeline's evidence. In the affidavit, Fuqua even acknowledges that, "[f]rom a finance industry standpoint, any supply contract that allows the buyer to establish a price now for future deliveries qualifies as a 'forward contract'" (Doc. # 48, ¶ 4). The remainder of the affidavit focuses on the fact that an agreement for the purchase and sale of a commodity, like the Agreement, is exempted from the definition of a forward contract by the Financial Accounting Standards Board

("FASB"). While this may create an issue as to how the Agreement is treated under FASB standards,[6] the Court thinks this immaterial as to how the Agreement is treated under the Code. Therefore, the Court holds that Bridgeline has satisfied its burden under Federal Rule of Civil Procedure 56 in demonstrating that the Agreement is a forward contract.

A review of the legislative history and market realities confirms this result. In enacting the 1982 amendments to the Code, Congress determined that "certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibl[y] threatening the collapse of the affected market." H.R. Rep. No. 97–420, at 1 (1982), U.S.Code Cong. & Admin.News 1982, p. 583. The House Report further states that the purpose of these amendments was "to clarify and, in some instances, broaden the commodities market protections" and to ensure that, "in the case of the commodities trading industry, the contractual right to liquidate a commodities contract or forward contract may not be stayed, avoided, or limited in any bankruptcy proceeding brought under Title 11." H.R. Rep. No. 97–420, at 2 (1982), U.S.Code Cong. & Admin.News 1982, pp. 583–84.

BCP argues the legislative history supports its position that Congress intended to exclude "normal purchase and sale agreements," which is the way BCP characterizes the Agreement (Doc. # 40, p. 4; Doc. # 47, p. 2). As an initial point, the Court notes that, as mentioned above, the Fifth Circuit rejected this exact same argument in *Olympic Natural Gas*. *Olympic Natural Gas*, 294 F.3d at 742 ("In sum, we see no reason to adopt the interpreta-

---

**6.** Bridgeline submitted the affidavit of Trevor Mihalik which stated that the Agreement was

a forward contract under FASB standards (Doc. # 41, Ex. G, p. 2).

tion the Trustee advocates, and distinguish between 'financial' forward contracts, and 'ordinary purchase and sale' forward contracts, when the statutory language makes no such distinction." (footnote omitted)). However, because the legislative history supports the conclusion reached by the Court, it is worthwhile to go through the argument.

BCP states that "[t]he House Report goes on to explain that while the avoidance exemptions apply to genuine forward contracts regarding commodities that are not currently listed in the Commodity Exchange Act, 'the exemptions do not apply to ordinary supply-of-goods contracts, which are not essentially financial in character' " (Doc. # 40, p. 4 (quoting H.R. REP. No. 101–484, at 6, U.S.Code Cong. & Admin.News 1990, pp. 223, 228) (emphasis added by BCP)). The paragraph from which this quote appears discusses the reason Congress modified § 101(25) so that the term "commodity" is defined by referencing the Commodities Exchange Act. H.R. REP. No. 101–484, at 6, U.S.Code Cong. & Admin.News 1990, pp. 223, 228. Given this context and the fact that both §§ 101(25) and 101(26) provide the same specific definition of commodity, it is clear that Congress was concerned about protecting only contracts for the future delivery of goods that are the subject of trading in the forward contract market. Therefore, as noted by the Fifth Circuit, there is no basis from which to distinguish amongst forward contracts.

In its attempt to prove the Agreement is not covered by § 546(e), BCP also puts much emphasis on the House Report's use of the term "hedge". The House Report provides that "[t]he primary purpose of a forward contract is to hedge against possible fluctuations in the price of a commodity. This purpose is financial and risk-shifting in nature, as opposed to the primary purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the commodity." H.R. REP. No. 101–484, at 4, U.S.Code Cong. & Admin.News 1990, pp. 223, 226. In his deposition, Joseph Shimo ("Shimo"), vice president of purchasing and planning at BCPM from 1998 through January of 2001, was asked about the Agreement's functioning and the following interaction occurred:

Q: Were you hedging at all?

A: Only to the extent that price involvement played a role, and it's really not hedging. Hedging is a financial instrument. But because of the—the prohibition by the board of directors to do financial transactions, everything was price orientated and volume orientated. So that if a hedge was placed, it wasn't a true hedge, it was the agreement of a price for a quantity of gas during a term.

Q: You didn't put an additional hedge on—with a another third party on this contract, did you?

A: That's correct

(Doc. # 26, Ex. DD, p. 28, l.5–18). In order for this not to constitute an acknowledgment that the Agreement is a forward contract, it presumes that the House Report intended a very specific financial meaning by its use of "hedge". BLACK'S LAW DICTIONARY defines "hedge" by two independent clauses. The first is "[t]o use two compensating or offsetting transactions to ensure a position of breaking even," BLACK'S LAW DICTIONARY 740 (8th ed.2004), which is arguably what the question was alluding to with the reference to involvement of third parties on the contract. However, the second clause defines hedge as "to make advance arrangements to safeguard oneself from loss on an investment, speculation, or bet, as when a buyer of commodities insures against unfavorable price changes by buying in ad-

vance at a fixed rate for later delivery." BLACK'S LAW DICTIONARY 740 (8th ed.2004). Shimo's description of what Borden was doing fits within the latter definition. Moreover, in Borden's amended annual report for the fiscal year ending December 31, 2000, a section titled "Commodity Risk" contains the following passage:

The Partnership generally does not use derivatives or other financial instruments such as futures contracts to manage commodity price risk. However, at certain times of the year the Partnership will enter into contracts whereby it agrees to purchase a specified quantity of natural gas (the Partnership's principal raw material) at a fixed price. Such contracts are generally not in excess of three months forward, and the Partnership generally limits such forward purchases to 60% of a month's requirements. In addition, the Partnership has entered into a fifteen year supply agreement (commencing in 1997) to provide a long-term supply of ethylene, a raw material, and minimize price volatility.

Borden Chemicals and Plastics Limited Partnership, Form 10–K/A, p. 22 (filed November 21, 2001) available at *http://www.sec.gov/Archives/ edgar/data/821202/ 000095013001505572/ 0000950130–01–505572.txt.* Between these statements it is clear that Borden was concerned about avoiding price volatility and that the Agreement provided security on this issue. As the legislative history indicates, the House intended § 546(e) to reach transactions that were "risk-shifting in nature", H.R. REP. No. 101–484, at 4, U.S.Code Cong. & Admin.News 1990, pp. 223, 226, which would include the risk that the price of a commodity like natural gas would rise or drop after a contract was executed.

On this point, the legislative history demonstrates that Congress intended that forward contracts, as defined by § 101(25), would possess both physical and financial characteristics. On the physical components, the Senate Report to the 1990 amendments explains that "[a] forward contract is a contract for the purchase, sale or other transfer of a commodity with a maturity date at least 2 days after the date the contract is entered into." S. REP. No. 101–285, 1990 WL 259288, at 2 (1990). On the financial characteristics and as already mentioned, the House Report to the 1990 amendments explains that "the principal purpose a forward contract is to hedge against possible fluctuations in the price of a commodity." H.R. REP. No. 101–484, at 4 (1990), U.S.Code Cong. & Admin.News 1990, pp. 223, 226. Similarly, the Senate Report states that "[f]orward contracts play a central role in the movement of commodities among producers and users, as well as in the hedging of risks associated with these and other transactions." S. REP. No. 101–285, 1990 WL 259288, at 2 (1990). Likewise, in the House Report to the 1990 Amendments, Congress stated that the primary purpose of a forward contract

is financial and risk-shifting in nature, as opposed to the primary purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the commodity. If the price of a commodity—such as crude oil or soybeans—rises or falls on some future date, the buyer or seller can minimize the risk involved through the use of forward contracts to offset the fluctuation in price from the date of the agreement to the actual date of transfer or delivery.

H.R. REP. No. 101–484, at 4 (1990), U.S.Code Cong. & Admin.News 1990, pp. 223, 226. It is clear from these statements that Congress intended to reach agreements whose purpose was to protect against the uncertainty of price fluctuations.

Bridgeline also submitted evidence demonstrating the unique risks associated with the natural gas market and how the Agreement addresses those issues and is commonly used in the market. Prices in the natural gas market are volatile because demand shifts quickly in response to weather changes and natural gas often cannot be moved to areas where there are unexpected increases in demand. *See Derivatives and Risk Management in the Petroleum, Natural Gas, and Electricity Industries*, Energy Information Administration, U.S. Dept. of Energy, at ix (October 2002) available at *http:// www.eia.doe.gov/oia f/servicerpt/derivative /pdf/srsmg(2002)01.pdf* (hereinafter, the "EIA Report"). As a means of isolating this price risk and reducing overall exposure to fluctuations in market price, many participants utilize derivatives. *Id.* at 4. One of the most commonly used derivative contracts in the energy market as a physical hedge against price is a forward contract, which is "an agreement between two parties to buy (sell) a specified quality and quantity of a good at an agreed date in the future at a fixed price or at a price determined by formula at the time of delivery to the location specified in the contract." *Id.* at x; *see also Analysis of Changes in Natural Gas Prices*, GAO-03-46, at 36 (December 2002), available at *http:// www.gao.gov/ new.items/d0346.pdf.* "[Over-the-Counter[7] ('OTC')] forward contracts and other OTC energy derivatives not only are the major form of energy derivatives but also have been the most rapidly growing." EIA Report at 39. This demonstrates that avoiding price fluctuation is a common issue in the natural gas market and that the Agreement is a common means of addressing the issue.

One feature of the Agreement that further highlights its financial nature is the so-called "NYMEX Trigger". On this facet of the Agreement, Hugh H. Connett's, president of Bridgeline, affidavit explains that §§ 3(c) and 5(c) of the Agreement provide that, as a substitute for the index pricing in § 5(a), Borden had the right to lock in a fixed price for up to 25,000 MMbtu per day, or 50% of its primary firm gas requirements. In order to "pull the NYMEX trigger," Borden was required to give Bridgeline notice of its election, including a monthly volume in multiples of 10,0000 MMbtu, and a price or price range by noon of the last trading day for a particular month's NYMEX natural gas futures contract (Doc. # 41, Ex. E, pp. 3–4; Doc. # 26, Ex. A, pp. 3–4). Borden could trigger this pricing mechanism for any number of months within the term of the Agreement (Doc. # 41, Ex. E, p. 4). Once Borden elected the NYMEX trigger option under the Agreement, Bridgeline was required to purchase a number of natural gas futures contracts on the NYMEX matching the volume and duration elected by Borden at an aggregate price at or near Borden's targeted price request (Doc. # 41, Ex. E, p. 4; Doc. # 26, Ex. A, p. 4 ("[Bridgeline] shall place an order with the NYMEX to purchase gas futures contracts at the price limits and quantities set forth by [Borden]")).

Moreover, the force majeure provisions of the Agreement in § 11, which generally excuse performance by the other party of their obligations under the Agreement, do not eliminate the obligation to pay cover

---

7. The NYMEX defines "over-the-counter" as "[a] term referring to derivative transactions that are conducted outside the realm of regulated exchanges. Transactions are conducted directly through banks or brokerage houses, or by principal-to-principal in the over-the-counter market." New York Mercantile Exchange: Glossary of Terms, p. 33 (June 4, 2001) available at *http://www.nymex.com/ media/glossary.pdf.*

costs for non-performance once Borden elects the NYMEX Trigger (Doc. # 26, Ex. A, p. 12). The reason for the exclusion is that operation of the NYMEX Trigger requires Bridgeline to take a position on the NYMEX that it would not have done absent Borden's request, with obligations to third parties outside of the Agreement (Doc. # 41, Ex. E, p. 5). A default by Borden for any reason could result in substantial losses to Bridgeline in the form of its payment obligations to those third parties, over and above any losses occasioned by Borden's default (Doc. # 41, Ex. E, p. 5). In addition, and as concerned the Senate, such a result to Bridgeline could have a negative impact on the third parties with whom Bridgeline had entered contracts.

While it is true, as BCP contends, that the NYMEX trigger was never implemented after the Agreement was assigned to Bridgeline, this is not dismissive. The NYMEX trigger is merely another component of the Agreement that demonstrates its financial attributes.

Bridgeline also submitted evidence demonstrating that, within the commodities market, there is a continuum of transactions from spot to forward to swaps and options to futures. *See* Paul J. Pantano, *The Implications of Enron on the Interplay Between the Jurisdictions of the CFTC and the FERC*, ABA 2002 Annual Meeting Materials, August 13, 2002, at 3, available at *http://www.abanet.org/ buslaw/ corporateresponsibility/ clearinghouse/02annual/ 37/pantano.pdf*. Generally, the commodities industry considers cash or spot transactions as trades in which the commodity is delivered against payment on or within two days of the trade date. *Id.* at 5 (citing 1 National Legal Research Group, Regulation of the Commodities Futures and Options Markets § 9.01 (2d ed.1995)); *see also Com-*

*modity Futures Trading Comm'n v. Int'l Finan. Servs. (N.Y.), Inc.*, 323 F.Supp.2d 482, 495 (S.D.N.Y.2004) (stating that the spot market "is essentially the current market, as opposed to the markets for future delivery"). Forward contracts, meanwhile, typically contemplate settlement between three days and five years. *Commodity Futures*, 323 F.Supp.2d at 495 n. 7. This time frame is consistent with the requirement contained in § 101(25) that a forward contract must have "a maturity date more than two days after the contract is entered into." 11 U.S.C. § 101(25); *see also* 5 COLLIER ON BANKRUPTCY § 556.02[2] at 556–5 n. 6 (15th ed. rev.2001) ("The clause 'with a maturity date more than two days after the date the contract is entered into' appears to exclude spot transactions from the definition of forward contract.").

As discussed above, the Agreement fits within the plain language of the Code provisions providing additional protections for forward contracts. This is enough to end this Court's inquiry. The Court notes, however, that it is also clear from the legislative history that Congress sought to protect forward contracts such as the Agreement in order to provide stability to the commodities market. Likewise, the Agreement is a commonly used forward contract in the natural gas market. For all of these reasons, the Court holds that the Agreement is a forward contract as Congress intended and therefore affords Bridgeline the potential shield of § 546.

■■ However, in addition to holding that the parties had entered into a forward contract, the Court must determine that the particular transfers at issue were made pursuant to that contract. *Newhouse v. Tex. E. Transmission Corp.*, 316 B.R. 481, 484 (Bankr.N.D.Tex.2004). The *Newhouse* court was faced with a situation where the base contract dictated that individual transactions would be entered into periodi-

cally and that the terms of such transactions would have written confirmation. *Id.* The court decided that, although the base contract may have constituted a forward contract, it could not grant summary judgment where the parties had not documented the individual transactions as required by the contract. *Id.* The court stated that there were material facts that needed resolution because it was not clear the particular transactions were entered into pursuant to the forward contract. *Id.*

The issue arises in this case because the December invoices, in contrast to the other invoices between the parties, do not contain a reference to the contract pursuant to which it was issued (*Compare* Doc. # 26, Exs. N–W & Z *with* Doc. # 26, Exs. X & Y). On this issue, Bridgeline submitted the affidavit of Trevor Mihalik ("Mihalik"), vice president of finance and chief financial officer of Bridgeline Gas Marketing, LLC (Doc. # 41, Ex. G). Mihalik's affidavit explains that invoices issued prior to the January invoice were generated through Bridgeline's automated billing system, which inserts the relevant contract number on the face of the invoice (*Id.* at 2). However, Bridgeline personnel prepared the January invoice manually and the failure to include the contract number was merely a clerical oversight by Bridgeline (*Id.*). While this behavior is out of the ordinary, Mihalik significantly explained that the Agreement was the only agreement that existed between Borden and Bridgeline and any invoices were issued pursuant to the terms of such Agreement (*Id.*).

BCP has not presented any evidence disputing the above statements. In fact, in its brief seeking summary judgment, BCP states that from and after April 1997, the natural gas supplied by Texaco (Bridgeline's predecessor) to Borden was supplied pursuant to the Agreement (Doc. # 23, pp. 2–3). Shimo testified that Borden purchased gas from Bridgeline under the Agreement from March of 2000 through January 2001 (Doc. # 26, Ex. DD, p. 33, l. 19–24; *id.*, p. 35, l. 16–22; *id.*, pp. 63, l. 20—64, l. 19). In addition, Shimo identified the January 11, 2001 invoice and confirmed that the volumes and amounts appeared to be correct (*Id.*, pp. 51, l. 3—52, l. 3). Likewise, Jim Stevning, Borden's Chief Financial Officer during the relevant period, testified at a deposition that he was not aware of any agreement other than the Agreement existing between the parties (Doc. # 26, Ex. EE, pp. 52, l. 11—53, l. 1).

Bridgeline came forward with evidence demonstrating that the January Payment satisfied an invoice that was issued pursuant to the Agreement. BCP did not come forward with any evidence that created a material issue on this point. Therefore, the Court holds that Bridgeline has sufficiently demonstrated that both the January and February Payments were made pursuant to the Agreement.

■ Having concluded that the Agreement is a forward contract and that the Payments were made pursuant to it, the Court now turns to whether either party qualifies as a forward contract merchant. As mentioned above, the Code defines a forward contract merchant as one whose "business consists in whole or in part of entering into forward contracts as or with merchants in a commodity ...." 11 U.S.C. § 101(26).[8] In discussing this pro-

---

8. The Court notes that BLACK'S LAW DICTIONARY defines merchant as "[o]ne whose business is buying and selling goods for profit; esp. a person or entity that holds itself out as having expertise peculiar to the goods in which it deals and is therefore held by the law to a higher standard of expertise than that of a nonmerchant." BLACK'S LAW DICTIONARY 1008 (8th ed.2004).

vision, *Collier* explains that Congress's addition of the phrase "in whole or in part" had the effect that "essentially any person that is in need of protection with respect to a forward contract in a business setting should be covered, except in the unusual instance of a forward contract between two nonmerchants who do not enter into forward contracts with merchants." · 5 COLLIER ON BANKRUPTCY § 556.03[2] at 556–6 (15th ed. rev.2001).

Although the parties do not conclusively address the issue about Bridgeline's role in supplying the gas, the March letter referring to the assignment provides guidance. The letter describes how Bridgeline is the product of an agreement between Texaco and Enron "to combine the companies' natural gas pipeline and storage businesses . . . ." (Doc. # 26, Ex. D). It further states that "[a]mong other activities [Bridgeline] will transact sales and purchases . . . ." (Doc. # 26, Ex. D). From these statements in the March letter and the course of conduct between the instant parties, it is easily inferred that Bridgeline acted as both a buyer and a seller of natural gas through the use of forward contracts. Based on the plain language of the statute and confirmed by the legislative history, the Court holds that Bridgeline qualifies as a forward contract merchant under the Code.

■ The final step in determining whether Bridgeline is entitled to the § 546(e) protections is deciding if the Payments constitute "settlement payments" under the Code. The Code broadly defines "settlement payment" to include "a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade." 11 U.S.C. § 101(51A); *see also In re Resorts Int'l, Inc.,* 181 F.3d 505, 515 (3d Cir.1999). In describing just how broadly settlement payment is defined, the Third Circuit has stated that it "includes transfers which are normally regarded as part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process for the particular type of transaction at hand." *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n,* 878 F.2d 742, 752 (3d Cir.1989). Indeed, Congress amended the definition of "settlement payment" in 1990 "to include the various settlement payments commonly used in the forward contract trade." H.R. REP. No. 101–484, at 6, U.S.Code Cong. & Admin.News 1990, pp. 223, 228. In doing this, Congress stated that "[c]oncerns have also been expressed that the definitions of 'settlement payment' and 'margin payment,' as used in the Bankruptcy Code provisions exempting forward contract setoffs from the automatic stay and trustee avoidance provisions, are not broad enough to include the types of such payments now in wide use in forward contract markets." H.R. REP. No. 101–484, at 4, U.S.Code Cong. & Admin.News 1990, pp. 223, 226. Pertinent to the instant matter, the NYMEX definition of forward contract specifies that "[p]ayment in full is due at the time of, or following, delivery." New York Mercantile Exchange: Glossary of Terms, p. 19 (June 4, 2001) available at *http:// www. nymex.com/media/ glossary.pdf.*

Section 14(a) of the Agreement provides that "[Borden] shall pay [Bridgeline] all applicable charges . . . within 10 days after the date of [Bridgeline]'s invoice." (Doc. # 26, Ex. 26, p. 14). BCP acknowledges that each month following delivery, Bridgeline would invoice Borden for the amount of gas delivered during the prior month (Doc. # 23, pp. 5–6). In addition, BCP acknowledges that, after receiving the invoices, Borden made the Payments

to Bridgeline (Doc. # 23, p. 6). Given that the Third Circuit has broadly defined settlement payment and the Payments comport with the NYMEX definition, the only conclusion is that these payments made following delivery of the natural gas are settlements commonly used in the forward contract market.

### CONCLUSION

Having established all the elements necessary to the application of § 546(e)'s defense to the trustee's avoiding powers, Bridgeline's motion for summary judgment is granted.

### ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the Defendant's motion (Doc. # 24) for summary judgment is GRANTED.