Justice Ginsburg
delivered the opinion of the Court.
The Bankruptcy Code accords a priority, among unsecured creditors’ claims, for unpaid “wages, salaries, or commissions,” 11 U. S. C. § 507(a)(4)(A), and for unpaid contributions to “an employee benefit plan,” § 507(a)(5).[1] It is uncontested here that § 507(a)(5) covers fringe benefits that complete a pay package — typically pension plans, and group health, life, and disability insurance — whether unilaterally provided by an employer or the result of collective bargaining. This case presents the question whether the *655 § 507(a)(5) priority also encompasses claims for unpaid premiums on a policy purchased by an employer to cover its workers’ compensation liability. We hold that premiums owed by an employer to a workers’ compensation carrier do not fit within § 507(a)(5).
Workers’ compensation laws ensure that workers will be compensated for work-related injuries whether or not negligence of the employer contributed to the injury. To that extent, arrangements for the payment of compensation awards might be typed “employee benefit plants].” On the other hand, statutorily prescribed workers’ compensation regimes do not run exclusively to the employees’ benefit. In this regard, they differ from privately ordered, employer-funded pension and welfare plans that, together with wages, remunerate employees for services rendered. Employers, too, gain from workers’ compensation prescriptions. In exchange for no-fault liability, employers gain immunity from tort actions that might yield damages many times higher than awards payable under workers’ compensation schedules. Although the question is close, we conclude that premiums paid for workers’ compensation insurance are more appropriately bracketed with premiums paid for other liability insurance, e.g., motor vehicle, fire, or theft insurance, than with contributions made to secure employee retirement, health, and disability benefits.
In holding that claims for workers’ compensation insurance premiums do not qualify for § 507(a)(5). priority, we are mindful that the Bankruptcy Code aims, in the main, to secure equal distribution among creditors. See Kothe v. R. C. Taylor Trust, 280 U. S. 224, 227 (1930); Kuehner v. Irving Trust Co., 299 U. S. 445, 451 (1937). We take into account, as well, the complementary principle that preferential treatment of a class of creditors is in order only when clearly authorized by Congress. See Nathanson v. NLRB, 344 U. S. 25, 29 (1952); United States v. Embassy Restaurant, Inc., 359 U. S. 29, 31 (1959).
*656 I
Petitioner Howard Delivery Service, Inc. (Howard), for many years owned and operated a freight trucking business. Howard employed as many as 480 workers and operated in about a dozen States. Each of those States required Howard to maintain workers’ compensation coverage to secure its employees’ receipt of health, disability, and death benefits in the event of on-the-job accidents. Howard contracted with Zurich to provide this insurance for Howard’s operations in ten States.
On January 30, 2002, Howard filed a Chapter 11 bankruptcy petition. Zurich filed an unsecured creditor’s claim in that proceeding, seeking priority status for some $400,000 in unpaid workers’ compensation premiums. In an amended proof of claim, Zurich asserted that these unpaid premiums qualified as “[(Contributions to an employee benefit plan” entitled to priority under § 507(a)(5). App. 32a.[2] The Bankruptcy Court denied priority status to Zurich’s claim, reasoning that the overdue premiums do not qualify as bargained-for benefits furnished in lieu of increased wages, hence they fall outside § 507(a)(5)’s compass. App. to Pet. for Cert. 51a-57a. The District Court affirmed, similarly determining that unpaid workers’ compensation premiums do not share the priority provided for unpaid contributions to employee pension and health plans. Id., at 39a-50a.
The Court of Appeals for the Fourth Circuit reversed 2 to 1 in a per curiam opinion. 403 F. 3d 228 (2005). The judges in the majority, however, disagreed on the rationale. Judge King concluded that § 507(a)(5) unambiguously accorded priority status to claims for unpaid workers’ compensation pre *657 miums. Id., at 237. Judge Shedd, concurring in the judgment, found the § 507(a)(5) phrase “employee benefit plan” ambiguous. Looking to legislative history, he concluded that Congress likely intended to give past due workers’ compensation premiums priority status. Id., at 238-239. In dissent, Judge Niemeyer, like Judge King, relied on the “plain meaning” of § 507(a)(5), but read the provision unequivocally to deny priority status to an insurer’s claim for unpaid workers’ compensation premiums. Id., at 241-244.
We granted certiorari, 546 U. S. 1002 (2005), to resolve a split among the Circuits concerning the priority status of premiums owed by a bankrupt employer to a workers’ compensation carrier. Compare In re Birmingham-Nashville Express, Inc., 224 F. 3d 511, 517 (CA6 2000) (denying priority status to unpaid workers’ compensation premiums), In re Southern Star Foods, Inc., 144 F. 3d 712, 717 (CA10 1998) (same), and In re HLM Corp., 62 F. 3d 224, 226-227 (CA8 1995) (same), with Employers Ins. of Wausau v. Plaid Pantries, Inc., 10 F. 3d 605, 607 (CA9 1993) (according priority status), and 403 F. 3d, at 229 (case below) (same).[3]
II
Adjoining subsections of the Bankruptcy Code, § 507(a)(4) and (5), are centrally involved in this case. Subsections 507(a)(4) and (5) currently provide:
*658 “(a) The following expenses and claims have priority in the following order:
“(4) Fourth, allowed unsecured claims ... for—
“(A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual....
“(5) Fifth, allowed unsecured claims for contributions to an employee benefit plan—
“(A) arising from services rendered within 180 days before the date of the filing of the [bankruptcy] petition or the date of the cessation of the debtor’s business, whichever occurs first. . . .” 11 U. S. C. §507.
Two decisions of this Court, United States v. Embassy Restaurant, Inc., 359 U. S. 29 (1959), and Joint Industry Bd. of Elec. Industry v. United States, 391 U. S. 224 (1968), prompted the enactment of § 507(a)(5). Embassy Restaurant concerned a provision of the 1898 Bankruptcy Act that granted priority status to “wages” but said nothing of “employee benefits plans” or anything similar. 11 U. S. C. § 104(a)(2) (1952 ed., Supp. V; repealed 1978). We held that a debtor’s unpaid contributions to a union welfare plan — which provided life insurance, weekly sick benefits, hospital and surgical benefits, and other advantages — did not qualify within the priority for unpaid “wages.” 359 U. S., at 29-35. In Joint Industry Bd., we followed Embassy Restaurant and held that an employer’s bargained-for contributions to an employees’ annuity plan did not qualify as “wages” entitled to priority status. 391 U. S., at 228-229.
To provide a priority for fringe benefits of the kind at issue in Embassy Restaurant and Joint Industry Bd., Congress added what is now § 507(a)(5) when it amended the Bankruptcy Act in 1978. See H. R. Rep. No. 95-595, p. 187 (1977) (hereinafter H. R. Rep.) (explaining that the amendment cov *659 ers “health insurance programs, life insurance plans, pension funds, and all other forms of employee compensation that [are] not in the form of wages”); S. Rep. No. 95-989, p. 69 (1978). Notably, Congress did not enlarge the “wages, salaries, [and] commissions” priority, § 507(a)(4), to include fringe benefits. Instead, Congress created a new priority for such benefits, one step lower than the wage priority. The new provision, currently contained in § 507(a)(5), allows the provider of an employee benefit plan to recover unpaid premiums — albeit only after the employees’ claims for “wages, salaries, or commissions” have been paid. § 507(a)(4).
Beyond genuine debate, the main office of § 507(a)(5) is to capture portions of employee compensation for services rendered not covered by § 507(a)(4). Cf. Embassy Restaurant, 359 U. S., at 35; Joint Industry Bd., 391 U. S., at 228-229 (both emphasizing Congress’ prerogative in this regard). The current Code’s juxtaposition of the wages and employee benefit plan priorities manifests Congress’ comprehension that fringe benefits generally complement, or “substitute” for, hourly pay. See H. R. Rep., at 357 (noting “the realities of labor contract negotiations, under which wage demands are often reduced if adequate fringe benefits are substituted”); id., at 187 (“[T]o ignore the reality of collective bargaining that often trades wage dollars for fringe benefits does a severe disservice to those working for a failing enterprise.”); In re Saco Local Development Corp., 711 F. 2d 441, 449 (CA1 1983) (majority opinion of Breyer, J.) (substitution of fringe benefits for wages “can normally be assumed, unless the employer is a philanthropist”).
Congress tightened the linkage of subsections (a)(4) and (a)(5) by imposing a combined cap on the two priorities, currently set at $10,000 per employee. See § 507(a)(5)(B).[4] Be *660 cause (a)(4) has a higher priority status, all claims for wages are paid first, up to the $10,000 limit; claims under (a)(5) for contributions to employee benefit plans can be recovered next up to the remainder of the $10,000 ceiling. No other subsections of §507 are joined together by a common cap in this way.
Putting aside the clues provided by Embassy Restaurant, Joint Industry Bd., and the textual ties binding § 507(a)(4) and (5), we recognize that Congress left undefined the § 507(a)(5) terms: “contributions to an employee benefit plan ... arising from services rendered within 180 days before the date of the filing of the [bankruptcy] petition.” (Emphasis added.) Maintaining that subsection (a)(5) covers more than wage substitutes of the kind at issue in Embassy Restaurant and Joint Industry Bd., Zurich urges the Court to borrow the encompassing definition of employee benefit plan contained in the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. § 1001 et seq. (2000 ed. and Supp. III). See §1002(1) (term “employee welfare benefit plan” means, inter alia, “any plan, fund, or program [that provides] its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . benefits in the event of sickness, accident, disability, death or unemployment”); § 1002(3) (term “employee benefit plan . . . means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit *661 plan”); cf. § 1003(b)(3) (excluding plans “maintained solely for the purpose of complying with applicable workers’] compensation laws or unemployment compensation or disability insurance laws”). The dissent endorses this borrowing. See post, at 676.
Federal courts have questioned whether ERISA is appropriately used to fill in blanks in a Bankruptcy Code provision, and the panel below parted ways on this issue. See 403 F. 3d, at 235, n. 9 (King, J., concurring in judgment) (“declin[ing] to rely upon the ERISA definition”); id., at 239-241 (Shedd, J., concurring in judgment) (reading legislative history to indicate that Congress intended “‘employee benefit plan’ in the bankruptcy priority provision to have the same meaning that [the term] has in ERISA”); id., at 245 (Niemeyer, J., dissenting) (maintaining that ERISA definition is inapt in Bankruptcy Code priority context); cf. Birmingham-Nashville Express, 224 F. 3d, at 516-517 (noting division of opinion but concluding that decisions rejecting incorporation of ERISA’s “employee benefit plan” definition into § 507(a)(5) “ha[ve] the better of the argument”); HLM Corp., 62 F. 3d, at 226 (“[T]he ERISA definition and associated court guidelines were designed to effectuate the purpose of ERISA, not the Bankruptcy Code.” (internal quotation marks omitted)); Southern Star Foods, 144 F. 3d, at 714 (same). Compare Brief for American Home Assurance Company et al. as Amici Curiae 17-25 (legislative history suggests Congress intended to incorporate ERISA definition) with Brief for National Coordinating Committee for Multiemployer Plans as Amicus Curiae 22-27, and n. 21 (legislative history suggests Congress did not intend to incorporate ERISA definition).
ERISA’s omnibus definition does show, at least, that the term “employee welfare benefit plan” is susceptible of a construction that would include workers’ compensation plans. That Act’s signals are mixed, however, for 29 U. S. C. § 1003(b)(3) specifically exempts from ERISA’s coverage the *662 genre of plan here at issue, i. e., one “maintained solely for the purpose of complying with applicable workers’] compensation laws.”[5] The § 1003(b)(3) exemption strengthens our resistance to Zurich’s argument. We follow the lead of an earlier decision, United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U. S. 213, 219 (1996), in noting that “[h]ere and there in the Bankruptcy Code Congress has included specific directions that establish the significance for bankruptcy law of a term used elsewhere in the federal statutes.” Id., at 219-220. No such directions are contained in § 507(a)(5), and we have no warrant to write them into the text.
This case turns, we hold, not on a definition borrowed from a statute designed without bankruptcy in mind, but on the essential character of workers’ compensation regimes. Unlike pension provisions or group life, health, and disability insurance plans — negotiated or granted as pay supplements or substitutes — workers’ compensation prescriptions have a dominant employer-oriented thrust: They modify, or substitute for, the common-law tort liability to which employers were exposed for work-related accidents. See 6 A. Larson & L. Larson, Workers’ Compensation Law §100.01[1], pp. 100-2 to 100-3 (2005) (hereinafter Larson & Larson); 4 J. Lee & B. Lindahl, Modern Tort Law: Liability and Litigation §43:25, pp. 43-45 to 43-46 (2d ed. 2003). As typically explained:
“The invention of workers compensation as it has existed in this country since about 1910 involves a classic social trade-off or, to use a Latin term, a quid pro *663 quo. . . . What is given to the injured employee is the right to receive certain limited benefits regardless of fault, that is, even in cases in which the employee is partially or entirely at fault, or when there is no fault on anyone’s part. What is taken away is the employee’s right to recover full tort damages, including damages for pain and suffering, in cases in which there is fault on the employer’s part.” P. Lencsis, Workers Compensation: A Reference and Guide 9 (1998) (hereinafter Lencsis).
Workers’ compensation regimes thus provide something for employees — they ensure limited fixed payments for on-the-job injuries — and something for employers — they remove the risk of large judgments and heavy costs generated by tort litigation. See 6 Larson & Larson §100.03[1], at 100-11 (“[Workers’ compensation] relieves the employer not only of common-law tort liability, but also of statutory liability under virtually all state statutes, as well as of liability in contract and in admiralty, for an injury covered by the compensation act.” (footnote omitted)); Lubove, Workmen’s Compensation and the Prerogatives of Voluntarism, 8 Lab. Hist. 254, 258-262 (Fall 1967) (workers’ compensation programs were adopted by nearly every State in large part because employers anticipated significant benefits from the programs; other programs workers’ groups sought to make mandatory — notably, health insurance — were not similarly embraced). No such tradeoff is involved in fringe benefit plans that augment each covered worker’s hourly pay.[6]
*664 Employer-sponsored pension plans, and group health or life insurance plans, characteristically insure the employee (or his survivor) only. In contrast, workers’ compensation insurance, in common with other liability insurance in this regard, e. g., fire, theft, and motor vehicle insurance, shield the insured enterprise: Workers’ compensation policies both protect the employer-policyholder from liability in tort, and cover its obligation to pay workers’ compensation benefits. See In re HLM Corp., 165 B. R. 38, 41 (Bkrtcy. Ct. Minn. 1994). When an employer fails to secure workers’ compensation coverage, or loses coverage for nonpayment of premiums, an affected employee’s remedy would not lie in a suit for premiums that should have been paid to a compensation carrier. Instead, employees who sustain work-related injuries would commonly have recourse to a state-maintained fund. See, e. g., Minn. Stat. § 176.183, subd. 1 (2004); N. Y. Work. Comp. Law Ann. § 26-a (West Supp. 2006). Or, in lieu of the limited benefits obtainable from a state fund under workers’ compensation schedules, the injured employee might be authorized to pursue the larger recoveries successful tort litigation ordinarily yields. See, e. g., id., § 11 (West 2005); W. Va. Code §23-2-8 (Lexis 2005); Lencsis 67.
Further distancing workers’ compensation arrangements from bargained-for or voluntarily accorded fringe benefits, nearly all States, with limited exceptions, require employers to participate in their workers’ compensation systems. See, e. g., Ill. Comp. Stat., ch. 820, § 305/4 (West 2004); Minn. Stat. § 176.181, subd. 2 (2004); U. S. Dept, of Labor, Office of Workers’ Compensation, State Workers’ Compensation Laws, Table 1: Type of Law and Insurance Requirements for Private Employment (2005), online at http://www.dol.gov/esa/ regs/statutes/owcp/stwclaw/tables-pdf/tablel.pdf (as visited *665 June 13, 2006, and available in Clerk of Court’s case file). An employer who fails to secure the mandatory coverage is subject to substantial penalties, even criminal liability. We do not suggest, as the dissent hypothesizes, see post, at 674, that a compensation carrier would gain § 507(a)(5) priority for unpaid premiums in States where workers’ compensation coverage is elective. Nor do we suggest that wage surrogates or supplements, e. g., pension and health benefits plans, would lose protection under § 507(a)(5) if a State were to mandate them. We simply count it a factor relevant to our assessment that States overwhelmingly prescribe and regulate insurance coverage for on-the-job accidents, while commonly leaving pension, health, and life insurance plans to private ordering.[7]
We note that when the Fourth Circuit confronted a claim for workers’ compensation premiums owed not to a private insurer but to a state fund, that court ranked the premiums as “excise taxes” qualifying for bankruptcy priority under what is now § 507(a)(8)(E). See New Neighborhoods, Inc. v. West Virginia Workers’ Comp. Fund, 886 F. 2d 714, 718-720 (1989).[8] See also In re Suburban Motor Freight, Inc., 998 *666 F. 2d 338, 342 (CA6 1993) (“Where a State ‘compels] the payment’ of ‘involuntary exactions, regardless of name,’ and where such payment is universally applicable to similarly situated persons or firms, these payments are taxes for bankruptcy purposes.” (quoting New Neighborhoods, 886 F. 2d, at 718-719; alteration in original)); LeRoy et al., Workers’ Compensation in Bankruptcy: How Do the Parties Fare? 24 Tort & Ins. L. J. 593, 623-624 (1989) (describing disagreement among courts on whether payments to state-run workers’ compensation funds qualify as excise taxes under § 507(a)(8)). We express no view on the § 507(a)(8)(E) issue presented in New Neighborhoods. We venture only this observation: It is common for Congress to prefer Government creditors over private creditors, see Birmingham-Nashville Express, 224 F. 3d, at 517-518; it would be anomalous, however, to advance Zurich’s claim to level (a)(5) while leaving state-fund creditors at level (a)(8).
Zurich argues that according its claim an (a)(5) priority will give workers’ compensation carriers an incentive to continue coverage of a failing enterprise, thus promoting rehabilitation of the business. It may be doubted whether the projected incentive would outweigh competing financial pressure to pull the plug swiftly on an insolvent policyholder, and thereby contain potential losses. An insurer undertakes to pay the scheduled benefits to workers injured on the job while the policy is in effect. In the case of serious injuries, however, benefits may remain payable years after termination of coverage. See 1 Larson & Larson §§ 10.02-10.03, at 10-3 to 10-7; Lencsis 51-52. While cancellation relieves the insurer from responsibility for future injuries, the insurer cannot escape the obligation to continue paying benefits for enduring maladies or disabilities, even though no premiums are paid by the former policyholder. An insurer *667 would likely weigh in the balance the risk of incurring fresh obligations of long duration were it to continue insuring employers unable to pay currently for coverage. That consideration might well be controlling even with an assurance of priority status, for there is no guarantee that creditors accorded preferred positions will in fact be paid. See Tr. of Oral Arg. 31-32 (“[A]s soon as they smell bankruptcy, they’re going to pull the plug anyway.” (SCALIA, J.)); LeRoy, supra, at 596 (noting “general reluctance on the part of private insurers to provide debtors with the necessary Workers’ Compensation coverage”).
Rather than speculating on how workers’ compensation insurers might react were they to be granted an (a)(5) priority, we are guided in reaching our decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed. See Kothe, 280 U. S., at 227 (“The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt’s estate ....”); Nathanson, 344 U. S., at 29 (“The theme of the Bankruptcy Act is 'equality of distribution’ . . . ; and if one claimant is to be preferred over others, the purpose should be clear from the statute.” (quoting Sampsell v. Imperial Paper & Color Corp., 313 U. S. 215, 219 (1941))); H. R. Rep., at 186; 2 Collier Bankruptcy Manual ¶ 507.01, p. 507-4 (rev. 3d ed. 2005) (“[P]riorities under the Code are to be narrowly construed.”).
Every claim granted priority status reduces the funds available to general unsecured creditors and may diminish the recovery of other claimants qualifying for equal or lesser priorities. See Joint Industry Bd., 391 U. S., at 228-229. “To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer.” In re Mammoth Mart, Inc., 536 F. 2d 950, 953 (CA1 1976). Cases like Zurich’s are illustrative. The Bankruptcy Code caps the amount recov *668 erable for contributions to employee benefit plans. See supra, at 659-660. Opening the (a)(5) priority to workers’ compensation carriers could shrink the amount available to cover unpaid contributions to plans paradigmatically qualifying as wage surrogates, prime among them, pension and health benefit plans.[9]
In sum, we find it far from clear that an employer’s liability to provide workers’ compensation coverage fits the § 507(a)(5) category “contributions to an employee benefit plan ... arising from services rendered.” Weighing against such categorization, workers’ compensation does not compensate employees for work performed, but instead, for on-the-job injuries incurred; workers’ compensation regimes substitute not for wage payments, but for tort liability. Any doubt concerning the appropriate characterization, we conclude, is best resolved in accord with the Bankruptcy Code’s equal distribution aim. We therefore reject the expanded interpretation Zurich invites. Unless and until Congress otherwise directs, we hold that carriers’ claims for unpaid workers’ compensation premiums remain outside the priority allowed by § 507(a)(5).
* * *
For the reasons stated, the judgment of the United States Court of Appeals for the Fourth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 All references to provisions of the Bankruptcy Code use the current numbering. At the time respondent Zurich American Insurance Company (Zurich) claimed priority treatment for unpaid workers’ compensation premiums, the relevant subsections were numbered (a)(3) (wages) and (a)(4) (employee benefit plans). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, §212(2), 119 Stat. 51, altered the priority list so that (a)(3) became (a)(4), and (a)(4) became (a)(5). The only other statutory change relevant here concerns the dollar amount accorded priority status under current § 507(a)(4) and (a)(5). When Zurich filed its proof of claim, the total sum allowed under those two subsections was $4,650 for each employee, see note following 11 U. S. C. § 104 (2000 ed., Supp. III). That ceiling has since been raised, pursuant to § 104, to $10,000 per employee, 11 U. S. C. A. § 507(a)(5)(B)® (Supp. 2006).

 In its initial proof of claim, Zurich did not check the box marked “Contributions to an employee benefit plan,” but instead checked a box marked “Other,” and wrote in “Administrative Expense — Insurance Premiums.” App. 22a, 30a. Zurich does not argue here that the workers’ compensation premiums owed by Howard qualify as administrative expenses entitled to priority under § 507(a)(2).

 We have jurisdiction of this case, as did the Court of Appeals, because the District Court’s ruling qualifies as a final decision under 28 U. S. C. § 158(d). See 403 F. 3d, at 231, and n. 6 (District Court’s ruling effectively concluded the dispute between Zurich and Howard, for the adverse decision rendered Zurich’s claim valueless and Zurich agreed to withdraw the claim if it failed to prevail on appeal). See also In re Saco Local Development Corp., 711 F. 2d 441, 444 (CA1 1983) (majority opinion of Breyer, J.) (“Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case — and in particular, it has long provided that orders finally settling creditors’ claims are separately appealable.”).

 Section 507(a)(5)(B) provides:
“(a) The following expenses and claims have priority in the following order:
*660 “(5) Fifth, allowed unsecured claims for contributions to an employee benefit plan—
“(B) for each such plan, to the extent of—
“(i) the number of employees covered by each such plan multiplied by $10,000; less
“(ii) the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.” 11 U.S. C. §507.

 Congress also excluded most workers’ compensation benefits from the purview of the Davis-Baeon Act, 40 U. S. C. § 3141(2) (2000 ed., Supp. III), a measure that fixes a floor under wages on Government projects. The Davis-Baeon Act incorporates “bona fide fringe benefits,” broadly defined, into prevailing wage determinations, but specifically excludes benefits contractors are required to provide under federal, state, or local law. § 3141(2)(B).

 Providing health care to workers fosters a healthy and happy work force, and a contented work force benefits employers. The dissent suggests this as a reason to rank workers’ compensation insurance with health and pension plans for bankruptcy priority purposes. See post, at 672. But the benefit employers gain from providing health and pension plans for their employees is of a secondary order; indeed, under the dissent’s logic, wages could be said to “benefit” the employer because they ensure that employees come to work, can afford transportation to the jobsite, etc. These benefits redound to the employer reflexively, as a consequence *664 of the benefit to the employee. Workers’ compensation insurance, by contrast, directly benefits insured employers by eliminating their tort liability for workplace accidents.

 Saco Local Development Corp., 711 F. 2d, at 448-449, we note, is not at odds with our conclusion that unpaid workers’ compensation premiums do not qualify for priority status. The First Circuit held in Saco that a group life, health, and disability insurance plan fit within § 507(a)(5), though the benefit package was unilaterally provided by the employer, and not installed pursuant to collective bargaining. Wage surrogates, then-Judge Breyer explained, need not be negotiated to qualify under § 507(a)(5) as “employee benefit plants],” for “Congress’ object in enacting [that subsection] was to extend the 1898 Act’s wage priority to new forms of compensation, such as insurance and other fringe benefits.” Id., at 449. Saco did not involve workers’ compensation regimes, and the First Circuit expressed no opinion on them.

 The state fund in New Neighborhoods, it appears, did not urge that claims for unpaid workers’ compensation premiums qualify for the higher (a)(5) priority. The Fourth Circuit’s opinion in that case, however, suggests that the court assumed a private compensation carrier would be *666 accorded no priority. See 886 F. 2d, at 720 (under court’s holding, “a state agency is given, as an insurer, priority in bankruptcy when a private insurer is not”).

 The dissenting opinion nowhere homes in on the reality that including amounts owed to workers’ compensation carriers risks diminishing funds available to cover contributions to workers’ pension and "health-care plans.