**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: NATIONAL GAS
DISTRIBUTORS, LLC,

*Debtor.*

---

RICHARD M. HUTSON, II, Trustee
for National Gas Distributors,
LLC,

*Plaintiff-Appellee,*

v.

E.I DU PONT DE NEMOURS AND
COMPANY, INCORPORATED;
SMITHFIELD PACKING COMPANY,
INCORPORATED, f/k/a Stadler's
Country Hams, Incorporated,

*Defendants-Appellants.*

No. 07-2105

---

INTERNATIONAL SWAPS AND
DERIVATIVES ASSOCIATION, INC.; BP
ENERGY COMPANY; BP CANADA
ENERGY MARKETING CORPORATION;
NEXEN MARKETING; NEXEN
MARKETING U.S.A. INC.,

*Amici Supporting Appellants,*

FIRST CITIZENS BANK & TRUST
COMPANY,

*Amicus Supporting Appellee.*

Appeal from the United States Bankruptcy Court
for the Eastern District of North Carolina, at Wilson.
A. Thomas Small, Bankruptcy Judge.
(8-06-AP-00266-ATS; 8-06-AP-00267-ATS; 8-06-AP-
00268-ATS)

Argued: October 28, 2008

Decided: February 11, 2009

Before NIEMEYER and MICHAEL, Circuit Judges, and
Richard D. BENNETT, United States District Judge for the
District of Maryland, sitting by designation.

---

Reversed and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Judge Michael and Judge Bennett joined.

---

**COUNSEL**

**ARGUED:** Earle Duncan Getchell, Jr., MCGUIREWOODS, L.L.P., Richmond, Virginia, for Appellants. John Arlington Northen, NORTHEN BLUE, L.L.P., Chapel Hill, North Carolina, for Appellee. **ON BRIEF:** Thomas E. Cabaniss, Dion William Hayes, MCGUIREWOODS, L.L.P., Richmond, Virginia; Robert A. Cox, Jr., MCGUIREWOODS, L.L.P., Charlotte, North Carolina, for Appellants. David M. Rooks, Vicki L. Parrott, Stephanie Osborne-Rodgers, NORTHEN BLUE, L.L.P., Chapel Hill, North Carolina, for Appellee. Joshua Cohn, Hugh McDonald, Anna Taruschio, Erika Singer, Matthew North, ALLEN & OVERLY, L.L.P., New York, New York; David M. Warren, POYNER & SPRUILL, L.L.P., Rocky Mount, North Carolina, for International Swaps and Derivatives Association, Inc., Amicus Supporting Appellants.

James S. Carr, Craig A. Wolfe, Benjamin Blaustein, KELLEY DRYE & WARREN, L.L.P., New York, New York, for BP Energy Company, BP Canada Energy Marketing Corporation, Nexen Marketing, and Nexen Marketing U.S.A. Inc., Amici Supporting Appellants. Michael P. Flanagan, Paul A. Fanning, WARD AND SMITH, P.A., Greenville, North Carolina, for First Citizens Bank & Trust Company, Amicus Supporting Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

On December 14, 2006, the Trustee in this Chapter 11 bankruptcy of National Gas Distributors, LLC, a distributor of natural gas to industrial, governmental, and other customers, commenced these adversary proceedings under 11 U.S.C. §§ 548(a) and 550(a) against three of National Gas' customers by filing complaints to avoid numerous natural gas supply contracts entered into with these customers during the year before the bankruptcy petition was filed. The Trustee alleged that the contracts and transfers of natural gas were fraudulent conveyances because they were made for less than market value and when the debtor was insolvent.

The customers, E.I. du Pont de Nemours and Company, the Smithfield Packing Company, Inc., and Stadler's Country Hams, Inc.,[1] filed motions to dismiss the Trustee's complaints or alternatively for summary judgment, claiming that the contracts were "swap agreements," which would provide them with a complete defense to the Trustee's complaints under the Bankruptcy Code, 11 U.S.C. §§ 546(g), 548(c), and 548(d)(2)(D). Specifically, they claimed that the contracts

---

[1] After entering into the contracts in question, Stadler's Country Hams and Smithfield Packing merged, and Smithfield Packing is a party as to its own contracts, as well as those of Stadler's Country Hams.

were "commodity forward agreements," which are included in the definition of "swap agreements." *See* 11 U.S.C. § 101(53B)(A)(i)(VII). They also claimed that they had taken the transfers in good faith, an assertion that the Trustee does not dispute.

The bankruptcy court denied the motions by orders dated May 24, 2007, finding that the contracts in question were not "swap agreements" as defined in 11 U.S.C. § 101(53B) but simply "agreement[s] by a single end-user to purchase a commodity" and therefore were not exempt from avoidance. Relying mostly on legislative history, the court concluded that in exempting "swap agreements," Congress intended to protect financial markets from the destabilizing effects of bankruptcy and that because the natural gas supply contracts in this case were physically settled and not traded in financial markets, exempting them from avoidance proceedings would not serve Congress' purposes.

The customers thereafter filed motions requesting the bankruptcy court to amend its orders insofar as the court made conclusions about the supply contracts that appeared to be factual in nature. The bankruptcy court denied the motions by orders dated June 20, 2007, noting that it had not decided the boundaries of what a swap agreement was under § 101(53B) but rather concluded, as a matter of law, that each contract at issue in this case was "simply an agreement by a single end-user to purchase a commodity" and therefore was not a swap agreement.

In this direct interlocutory appeal from the bankruptcy court's orders, we conclude that the grounds given by the bankruptcy court in finding that the contracts in this case were not swap agreements are not supported by the definition of "swap agreement" in 11 U.S.C. § 101(53B). Accordingly, we reverse and remand for further proceedings, allowing the customers to attempt to demonstrate factually and legally that

their natural gas supply contracts were swap agreements based on any classification included in § 101(53B).

## I

During the year before National Gas filed its petition, du Pont, Smithfield Packing, and Stadler's Country Hams purchased natural gas for specific facilities under a series of contracts with National Gas. The contracts consisted of a "Base Contract for Sale and Purchase of Natural Gas," using Standard Form 6.3.1 of the North American Energy Standards Board, Inc., and a series of e-mails confirming telephone conversations between representatives of the parties in which they fixed the price of future deliveries of natural gas during specified time periods. Performance of the contracts formed in this way always commenced more than two days after the contract's formation and fixed the price of gas for a period of months for each designated facility. The contracts required National Gas to sell and deliver the gas and the customer to receive and purchase the gas at the specified price, regardless of the market price of natural gas, or to pay the difference between the agreed-upon price and the market price.

In this manner, these natural gas supply contracts provided a hedge against fluctuations in the market price of natural gas and the adverse effects such fluctuations might have on the customers' operations. Although the contracts were not transferred on exchanges, nor did they even involve the use of brokers or middlemen, the customers did use them, along with other forwards and derivatives, to manage their commodity risks.

There is no suggestion in this case that any party breached any one of the contracts, and the Trustee agrees that the customers in this case acted in good faith both in entering into the contracts and in receiving transfers under them.

On January 20, 2006, National Gas filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and

shortly thereafter, the bankruptcy court appointed Richard M. Hutson, II, as Trustee. The Trustee thereafter filed complaints against more than 20 former customers of National Gas, including du Pont and Smithfield Packing, seeking to avoid the contracts under 11 U.S.C. § 548(a) and to recover the transfers from the customers pursuant to 11 U.S.C. § 550(a) on the ground that the contracts and transfers were fraudulent. The Trustee alleged that National Gas entered into contracts to sell natural gas to the customers at below market prices and that at the time of the transfers, National Gas was insolvent, thereby resulting in a constructively fraudulent conveyance. *See* 11 U.S.C. § 548(a)(1)(B). In the alternative, the Trustee alleged that the former management of National Gas intentionally used the contracts to "hinder, delay, or defraud" National Gas' creditors, thereby engaging in an actually fraudulent conveyance. *See* 11 U.S.C. § 548(a)(1)(A). The Trustee sought to recover the cash value of the difference between the market prices when the customers took delivery and the prices they paid under the contracts, which the Trustee alleged is over $4 million.

The customers, du Pont and Smithfield Packing, filed motions to dismiss the complaints or for summary judgment, contending that the Trustee cannot avoid the contracts and transfers because "each Transfer was made by or to a swap participant under or in connection with a swap agreement" and was thus not avoidable under 11 U.S.C. §§ 546(g) and 548(d)(2)(D). As they asserted, a "swap agreement" is defined in § 101(53B) to include a "commodity forward agreement," which they allege covers the natural gas supply contracts in this case. The customers also contended that they received the transfers for value and that, as conceded by the Trustee, they received such transfers "in good faith."

The bankruptcy court denied the customers' motions by orders dated May 24, 2007, concluding that the natural gas supply contracts in this case were not "commodity forward agreements." Based on legislative history, as well as its con-

struction of § 101(53B), the court ruled that the natural gas supply contracts in this case were insufficiently tied to financial markets to be commodity forward agreements. *In re Nat'l Gas Distributors, LLC*, 369 B.R. 884, 897-900 (Bankr. E.D.N.C. 2007). More particularly, the court found that "commodity forward agreements" must be "regularly the subject of trading" in financial markets and must be settled by financial exchanges of differences in commodity prices, whereas the contracts in this case were directly negotiated between the seller and purchaser and contemplated physical delivery of the commodity to the purchasers. *Id.* at 898-99.

The customers filed motions to amend the May 24 orders, requesting the court to eliminate or clarify certain statements in its opinion that could be construed as factual findings and to leave open factual issues for later development. By orders dated June 20, 2007, the bankruptcy court denied the motions to amend, stating that it had "not endeavor[ed] to determine the defining boundaries of 'swap agreements' under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, or anything approaching an issue that broad." The court noted that it had only decided "whether, as a matter of law, the contract between the parties came within the newly expanded definition of swap agreement," *i.e.*, "within the parameters of a swap agreement as defined by § 101(53B)." After pointing out that it did not purport to construe the various types of agreements that qualified as swap agreements, it said that it "determined, after review of the pleadings, the contract and related documents submitted by [the customers], the relevant statutes, and the legislative history, that the contract[s] *at issue here* [are] simple supply contract[s]" and that the contracts were "not in that league" of agreements defined as "swap agreements."

The district court granted the customers permission to file an interlocutory appeal with respect to both the May 24 and June 20 orders and certified the questions to this court for

direct appeal. We authorized direct appeal and accordingly have jurisdiction pursuant to 28 U.S.C. § 158(d)(2).

## II

Since enactment of the 1978 Bankruptcy Code, Congress has provided safe harbors from the destabilizing effects of bankruptcy proceedings for parties to specified commodities and financial contracts in order to protect financial markets. To do this, Congress limited the application to these parties of Bankruptcy Code provisions such as the automatic stay and trustee avoidances of preferences and fraudulent conveyances. It was thought that financial market stabilization would be achieved under the following rationale:

> These exceptions or "safe harbors" are necessary, it is thought, for the protection of financial markets, including over-the-counter ("OTC") markets on which most derivatives contracts are executed. Without these safe harbors, markets might suffer serious shocks — perhaps even a systemic liquidity crisis, causing markets to collapse — when debtors enter bankruptcy. Counterparties to financial contracts would find themselves subject to the automatic stay for extended periods. They would be unable to liquidate volatile contracts and thereby limit their exposure to market movements. Additionally, a debtor in bankruptcy would be free to "cherrypick" multiple contracts with the same party. Instead of netting the contracts — *i.e.*, setting-off losses under some contracts against gains under others *with the same counterparty* — the debtor could dispose of the contracts independently. "In-the-money" contracts could be assumed; "out-of-the-money" contracts could be rejected. In this way, the debtor could lock-in gains on profitable contracts and (due to its insolvency) limit liability for losses under unprofitable ones. The counterparty to these contracts would find itself pay-

ing in full on the assumed contracts and receiving only a fraction of its claim on the rejected. Losses from indefinite exposure to market movements and from cherrypicking could produce financial distress in the counterparty itself, forcing it to default on its own contracts with other parties. As one distressed party infects another, a domino effect could ensue, undermining the entire financial market.

Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code: Insulating Markets From Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr. Inst. L. Rev. 641, 642 (2005) (footnotes omitted).

This explanation appears to be an accurate description of the basis on which Congress relied to justify providing safe harbors to participants in financial derivatives markets. As the House Report in connection with the 1982 Amendments to the Bankruptcy Code stated:

Due to the structure of the clearing system in the commodities industry and the sometimes volatile nature of the commodities market, the Bankruptcy Code, as enacted in 1978, expressly provides certain protections to the commodities market to insure the stability of the market. These protections are intended to prevent the insolvency of one commodity firm from spreading to other brokers or clearing agencies and possibly threatening the collapse of the market.

H.R. Rep. No. 97-420, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 584 (citation omitted). And similarly, in connection with the 1990 Amendments to the Bankruptcy Code, the House Report stated:

U.S. bankruptcy law has long accorded special treatment to transactions involving financial markets, to

minimize volatility. Because financial markets can change significantly in a matter of days, or even hours, a non-bankrupt party to ongoing securities and other financial transactions could face heavy losses unless the transactions are resolved promptly and with finality.

H.R. Rep. No. 101-484, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224.

With the 2005 Amendments to the Bankruptcy Code, adopted in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"), Congress substantially expanded the protections it had given to financial derivatives participants and transactions by expanding the definition of "swap participants" and "swap agreements" that are exempted from the automatic stay and from trustees' avoidance powers. As the House Report attached to the 2005 bill explained,

As amended, the definition of "swap agreement" will update the statutory definition and achieve contractual netting across economically similar transactions that are the subject of recurring dealings in the swap agreements.

The definition of "swap agreement" originally was intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured. To that end, the phrase "or any other similar agreement" was included in the definition.

H.R. Rep. No. 109-31, pt. 1, at 121 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 183. The current definition of "swap agreement" is now extremely broad, covering several dozen enumerated contracts and transactions, as well as combinations of them, options on them, and similar contracts or transactions.

*See* 11 U.S.C. § 101(53B)(A). And the Code now protects *all* counterparties to these agreements, whereas before 2005, the Code's safe harbors protected only certain counterparties. *Compare* 11 U.S.C. § 101(53C) (2006) (defining "swap participant" very broadly) *with* 11 U.S.C. § 101(26) (2000) (defining "forward contract merchant" narrowly). *See generally* Morrison & Riegel, *supra*, at 641-42. The resulting statutory scheme may be summarized readily, although its application proves more difficult.[2] Under the Bankruptcy Code, trustees are authorized to avoid contracts and transfers of debtors' property "made or incurred on or within 2 years before the date of the filing of the petition" when the contract or transfer amounts to a fraudulent contract or transfer, as fraudulent is defined in the Code. 11 U.S.C. § 548(a). The Code, however, exempts from this avoidance authority transfers "made by or to a swap participant or financial participant, under or in connection with any swap agreement." 11 U.S.C. § 546(g); *see also* 11 U.S.C. § 548(d)(2)(D). The term "swap participant" is defined to mean "an entity that . . . has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). And "swap agreement," in turn, is defined to mean, as relevant here:

> (i) any agreement, including the terms and conditions incorporated by reference in such agreement, which is —

> \* \* \*

> (II) a spot, same day-tomorrow, tomorrow-

---

[2]In this case, we refer to and apply the 2005 statutory language in effect at the time this case was commenced, unless otherwise indicated. Although Congress did make a number of technical and clarifying changes to the language, effective December 12, 2006, it expressly stated those changes should not apply to cases commenced before the enactment date. Pub. L. No. 109-390, § 7, 120 Stat. 2692, 2700 (2006). This case was commenced by the filing of a voluntary petition on January 20, 2006.

next, forward, or other foreign exchange or precious metals agreement;

*     *     *

(VII) a commodity index or a commodity swap, option, future, or forward agreement; or

*     *     *

(ii) any agreement or transaction that is similar to any other agreement or transaction referred to in this paragraph and that —

(I) is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap markets (including terms and conditions incorporated by reference therein); and

(II) is a forward, swap, future, or option on one or more rates, currencies, commodities, equity securities, or other equity instruments, debt securities or other debt instruments, quantitative measures associated with an occurrence, extent of an occurrence, or contingency associated with a financial, commercial, or economic consequence, or economic or financial indices or measures of economic or financial risk or value;

(iii) any combination of agreements or transactions referred to in this subparagraph; . . . .

11 U.S.C. § 101(53B)(A). Most of the transactions listed in the definition, however, are not defined in the Bankruptcy

Code. As a result, courts must rely on normal principles of statutory interpretation, including dictionary definitions and legislative history.

In this case, National Gas' customers, du Pont and Smithfield Packing, invoked the protections of 11 U.S.C. §§ 546(g) and 548(d)(2)(D), alleging that their natural gas supply contracts with National Gas were "swap agreements" as defined in 11 U.S.C. § 101(53B) in that they were "commodity forward agreements," a class of transactions listed in the definition of "swap agreement." 11 U.S.C. § 101(53B)(A)(i)(VII). "Commodity forward agreement," however, is not itself defined in the Bankruptcy Code, and no case to date has provided a definition.

The bankruptcy court, in a staunch effort, conducted an analysis of § 101(53B) and drew on legislative history to conclude that a "commodity forward agreement" has to be traded in a financial market and cannot involve physical delivery of the commodity to an end user. *In re Nat'l Gas Distributors*, 369 B.R. at 898-99. Concluding that the contracts in this case were not traded in financial markets but were simply natural gas supply contracts, the bankruptcy court held that they were not "commodity forward agreements" exempt from the Trustee's avoidance authority. *Id.* at 900.

In this case of first impression, we are therefore left to define "commodity forward agreement" without being given any definition by the Bankruptcy Code.

III

At the outset, we note that the Bankruptcy Code and the financial marketplace recognize differences in the definitions of terms that common parlance might not recognize. Thus, the Bankruptcy Code uses both "forward *contract*" and "forward *agreement*" but defines only "forward *contract*," and not "forward *agreement*," apparently making a distinction between

the terms. The House Report that accompanied the 2005 Amendments enacted as part of BAPCPA appears to confirm this:

> The use of the term "forward" in the definition of "swap agreement" is not intended to refer only to transactions that fall within the definition of "forward contract." Instead, a "forward" transaction could be a "swap agreement" even if not a "forward contract."

H.R. Rep. 109-31, pt. 1, at 122, *reprinted in* 2005 U.S.C.C.A.N. at 184. And this legislative history comports with the distinction made between "contracts" and "agreements" in *Black's Law Dictionary*. As *Black's* states, "[t]he term 'agreement,' although frequently used as synonymous with the word 'contract,' is really an expression of greater breadth of meaning and less technicality. Every contract is an agreement; but not every agreement is a contract." *Black's Law Dictionary* 74 (8th ed. 2004) (internal quotation marks and citation omitted).

A distinction also exists in the meanings of a "*future* agreement" and a "*forward* agreement." Even though both are included in the definition of a "swap agreement," 11 U.S.C. § 101(53B)(A), the marketplace makes a distinction, at least where the terms "future" and "forward" are used in conjunction with "contract." The Chicago Mercantile Exchange's online glossary's definition states that "[i]n contrast to *futures* contracts, *forward* contracts are not standardized and not transferable." *CME Glossary of Terms*, http://www.cme.com/glossary/F.html (last visited Jan. 16, 2009).

In holding in this case that the natural gas supply contracts are not "commodity forward agreements" exempt from the Trustee's avoidance efforts, the bankruptcy court concluded that all of the agreements or transactions listed in 11 U.S.C. § 101(53B)(A)(i) were "financial instruments traded in the

swap markets," and therefore, if any agreement was not traded on an exchange or in a financial market, it could not be a "swap agreement." *In re Nat'l Gas Distributors*, 369 B.R. at 898-99. To support its conclusion, the court referred to repeated references in the legislative history to "swap markets" and relied on its construction of the language of 11 U.S.C. § 101(53B):

> It is true enough that § 101(53B)(A)(i) lists numerous agreements that fall within the definition of "swap agreement." Section 101(53B)(A)(ii) provides for additional agreements or transactions that are "similar" to those referred to in § 101(53B)(A)(i) *and* are the subject of recurrent dealings in the swap market *and* are forwards, swaps, futures, or options "on one or more rates, currencies, commodities, equity securities, or other equity instruments . . ." The word "similar," rather than expanding the universe of agreements that come within the umbrella of swap agreements, actually limits the agreements to those that "bear[] a family resemblance" to the other agreements and transactions that enjoy the protections of the Bankruptcy Code. The other agreements described in § 101(53B)(A)(i) are found in financial markets. They do not include contracts between a seller and an end-user for delivery of a product that happens to be a recognized commodity.

*Id.* at 899 (citation omitted). After concluding that each contract in this case was "simply an agreement by a single end-user to purchase a commodity," which was physically delivered to the purchaser, *id.*, the court explained that a traditional supply contract is not "swept into the realm of swap agreements":

> There is nothing to suggest that the contract between Smithfield and the debtor was traded on a financial

market, so in this case only the debtor's estate and Smithfield would be affected by a recovery.

*Id.*

If one were to assume, as the bankruptcy court did, that all swap agreements, including "commodity forward agreements," must be traded on exchanges or in financial markets and that the contracts in this case were simple supply contracts, the court's position is logically sound. The assumptions, however, do not withstand closer scrutiny.

Because the term "agreement" is broader than the term "contract," as discussed above, a forward *contract* must also be a forward *agreement* (although it does not follow that every forward agreement is a forward contract). We can therefore look to the Bankruptcy Code's definition of "forward contract," *see* 11 U.S.C. § 101(25), to determine whether the bankruptcy court gave too restrictive a definition for "forward agreement." If a forward contract need not be traded on an exchange or in a financial market, it follows that neither does a forward agreement need to be traded on an exchange or in a financial market.[3]

The Bankruptcy Code does not require that a "forward contract" be traded on an exchange or in a market. Section 101(25)(A) defines "forward contract" to mean "a contract (other than a commodity contract)," distinguishing a "forward contract" from a "commodity contract." The term "commodity contract" specifically includes contracts "on, or subject to the rules of, a contract market or board of trade." 11 U.S.C.

---

[3]National Gas' customers in this case do not attempt to rely on the position that the natural gas supply contracts are "forward contracts," as defined in 11 U.S.C. § 101(25). The classification of the contracts in this case as "forward contracts" provides little advantage to a party who does not claim to be a "forward contract merchant," which the customers presumably do not claim, at least in this appeal. *See* 11 U.S.C. § 101(26) (defining "forward contract merchant").

§ 761(4). By explicitly excluding "commodity contracts" from the definition of "forward contracts," Congress apparently intended that "forward contracts" need not be traded on any exchange or in any financial market. *See In re Borden Chems. & Plastics Operating LP*, 336 B.R. 214, 218 (Bankr. D. Del. 2006). Congress reinforced this reading in 2006, when it amended § 101(25)(A) to include "as defined in section 761" in the parenthetical after "commodity contract." Pub. L. No. 109-390, § 5(a)(1), 120 Stat. 2692, 2695 (2006). The legislative history stated that this was a "technical and clarifying change[]." H.R. Rep. No. 109-648, pt. 1, at 6-7 (2006), *reprinted in* 2006 U.S.C.C.A.N. 1585, 1591-92. *See generally* 5 *Collier on Bankruptcy* ¶ 556.02[2] (15th ed. rev. 2008).

Courts have accordingly found no requirement that "forward contracts" be traded on an exchange or in a market, noting that they may be directly negotiated, in much the same manner as the contracts in this case. *See, e.g.*, *In re Olympic Natural Gas Co.*, 294 F.3d 737, 741 (5th Cir. 2002). And, various non-bankruptcy cases have used "forward agreement" to refer to non-market traded, private agreements. *See Donoghue v. Centillium Communications, Inc.*, No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *2 (S.D.N.Y. Mar. 28, 2006); *Breyer v. First Nat'l Monetary Corp.*, 548 F. Supp. 955, 962 (D.C.N.J. 1982).

Finally, *Black's Law Dictionary* distinguishes a "forward contract" from a "futures contract" on the basis that a futures contract is traded on a formal exchange. "Unlike a futures contract, a forward contract is not traded on a formal exchange." *Black's Law Dictionary* 345 (8th ed. 2004).

The weight of authority thus indicates that "forward *contracts*" are not found only in the financial markets. Rather, they may be directly negotiated, as were the contracts in this case. Because we conclude that every "forward *contract*" is also a "forward *agreement*," it follows that we must reject the district court's assumption that all of the agreements in

§ 101(53B)(A)(i) must be "found in the financial markets." *See In re Enron Corp.*, 306 B.R. 465, 469 (Bankr. S.D.N.Y. 2004) (characterizing directly negotiated natural gas hedging agreements as "swap agreements"); *see also In re Interbulk, Ltd.*, 240 B.R. 195, 197 (Bankr. S.D.N.Y. 1999) (agreements negotiated by telephone were "swap agreements").

The bankruptcy court also assumed that the contracts in this case were "simple supply contract[s]," which are not within the definition of a swap agreement. *In re Nat'l Gas Distributors*, 369 B.R. at 893, 900. But this assumption is an oversimplification. Although the contracts in this case did provide a supply of gas to the customers' facilities, they also were part of a series of contracts by which the customers hedged their risk of future fluctuations in the price of natural gas. Although it is true that these particular contracts were not traded in financial markets — and perhaps were not even assignable — they nonetheless could have an influence on markets in which participants enter into hedging agreements. A business can enter into a forward agreement with a party who then, in reliance on that forward agreement, enters into another contract with yet another market participant, who in turn may enter into even other contracts. And so a simple forward agreement may readily become tied into the broader markets that Congress aimed to protect in BAPCPA. The Seventh Circuit described this same type of situation in *Nagel v. ADM Investor Servs., Inc.*, 217 F.3d 436, 438-39 (7th Cir. 2000), where farmers entered into forward contracts with grain merchants who, in reliance upon their contracts with the farmer, proceeded to turn around and enter into futures contracts on established commodities markets. In this case, the customers claim a similar relationship with markets, alleging that their contracts with National Gas were hedging contracts that were only a part of a larger risk management program in which the customers "regularly use[d] forwards and other derivatives."

The bankruptcy court's conclusion that these contracts were simple supply contracts also rested on the fact that the

contracts involved the physical delivery of gas, thus distinguishing them from contracts settled financially. The court concluded that a "commodity forward agreement" must have a financial settlement, such as when settlement occurs by the "losing" party transferring cash or financial assets to the "winning" party at the specified time. Thus, supply contracts, contemplating physical delivery of the commodity to purchasers, could not qualify as "commodity forward agreements."

Although the legislative history of BAPCPA does provide support for the notion that traditional supply agreements are not "swap agreements," *see* H.R. Rep. No. 109-31, pt. 1, at 122, *reprinted in* 2005 U.S.C.C.A.N. at 183 (noting that "[t]raditional commercial arrangements, such as supply agreements" cannot be treated as swap agreements under the Bankruptcy Code), the conclusion that the contracts in this case are traditional supply contracts overlooks the fact that the contracts in this case contained real hedging elements. The contracts obliged the customers to buy, and National Gas to sell, gas on a future date at a price fixed at the time of contracting, regardless of fluctuations in the market price. And if either party did not perform, that party was required to pay the difference between the contract price and the market price.

Nothing in the Bankruptcy Code or in its legislative history suggests a requirement that a forward agreement cannot involve the actual delivery of the commodity. Numerous courts have found that "forward *contracts*" may be physically settled, and it follows that "forward *agreements*" may likewise be physically settled. *See In re Olympic Natural Gas Co.*, 294 F.3d at 742 (observing that there was "no reason to adopt the interpretation the Trustee advocates, and distinguish between 'financial' forward contracts, and 'ordinary purchase and sale' forward contracts, when the statutory language makes no such distinction"); *In re Borden*, 336 B.R. at 223 (characterizing physically settled natural gas supply agreements as "forward contracts").

Congress' inclusion of "spot" commodity transactions in the definitions contained in § 101(53B) further refutes the bankruptcy court's position that "swap agreements" cannot involve physical delivery. The definition of a spot agreement is one in which the commodity is "available for immediate *delivery* after sale." *Merriam-Webster's Collegiate Dictionary* 1208 (11th ed. 2007) (emphasis added). The definition of "swap agreement" in the BAPCPA includes "*spot*, same day-tomorrow, tomorrow-next, *forward*, or other foreign exchange or *precious metals agreement*." 11 U.S.C. § 101(53B)(A)(i)(II) (emphasis added). Similarly, in 2006, as part of the "technical and clarifying changes," Congress added "spot transaction" in the catchall clause in § 101(53B)(A)(ii). Pub. L. No. 109-390, § 5, 120 Stat. at 2696; H.R. Rep. No. 109-648, pt. 1, at 6-7, *reprinted in* 2006 U.S.C.C.A.N. at 1591-92.

We thus conclude that Congress did not preclude physical delivery in connection with a "commodity forward agreement," as defined in § 101(53B)(A).

Because the bankruptcy court gave the definition of "commodity forward agreement" a more narrow reading than the statute bears, we reverse its orders of May 24, 2007, and June 20, 2007, and remand for further proceedings consistent with this opinion.

IV

In remanding, we do not direct the bankruptcy court to find that the contracts in this case are "commodity forward agreements" or "swap agreements." Rather, we return this case for further consideration of the issue in light of the law and the facts. In determining whether the contracts in this case are "commodity forward agreements," the bankruptcy court will not, unfortunately, have the benefit of developed case law, nor even the benefit of clear marketplace definitions. The marketplace is creative, designing instruments to fit the needs of the moment, and Congress sought to anticipate this in BAPCPA.

In doing so, however, Congress forwent describing the elements of transactions it sought to exempt from the effects of bankruptcy. Indeed, its repetitive generalized comments about protecting financial markets from the instability that bankruptcy proceedings might cause and the potpourri of agreements included in the term "swap agreement" barely distinguish any major commercial contract from a swap agreement.

Moreover, the policies informing these provisions of the Bankruptcy Code are often in tension. Even though an overarching policy of the Bankruptcy Code is to provide equal distribution among creditors, *see Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006), in enacting 11 U.S.C. §§ 546(g) and 548(d)(2)(D), Congress intended to serve a countervailing policy of protecting financial markets and therefore favoring an entire class of instruments and participants.

Notwithstanding the language of the Bankruptcy Code and the generalized language of the legislative history, courts and academics have attempted to define swap agreements based on the functioning of markets. *See, e.g.*, *In re Enron Corp.*, 328 B.R. 58, 69-70 (Bankr. S.D.N.Y. 2005) (quoting *In re Interbulk*, 240 B.R. at 201). But consulting these generalized definitions may not always contribute much to the appropriate interpretation of 11 U.S.C. § 101(53B), which contains its own counterintuitive definitions, as well as inconsistencies.

In concluding that the bankruptcy court in this case construed "commodity forward agreements" too narrowly — *i.e.*, by requiring that they be traded on an exchange and not involve physical delivery of the commodity — we do so only on the basis of the imperfect statute, recognizing the bankruptcy court's rational intuitions. Although we do not attempt to provide a definition ourselves, we can point to certain non-exclusive elements that the statutory language appears to require.

First, the subject of a commodity forward agreement must be a commodity. That is, substantially all of the expected costs of performance must be attributable to the expected costs of the underlying commodity, determined at the time of contracting. This element, which is inherent in the word "commodity," distinguishes a commodity forward agreement, in which the benefits or detriments depend on future fluctuations in commodity prices, from many supply contracts, in which costs attributable to other factors, such as packaging, marketing, transportation, service, and similar matters contribute to a greater portion of the costs.

Second, a forward commodity contract, in being "forward," must require a payment for the commodity at a price fixed at the time of contracting for delivery more than two days after the date the contract is entered into. *Cf.* 11 U.S.C. § 101(25)(A) (requiring the same of "forward contracts"). A maturity date in the future means that the benefit or detriment from the contract depends on future fluctuations in the market price of the commodity.

Third, as a forward agreement in relation to a commodity, in addition to the price element, the quantity and time elements must be fixed at the time of contracting. *See, e.g.*, *In re Olympic Natural Gas Co.*, 294 F.3d at 739 (the forward contract at issue contained "the price, quantity, timing, and delivery point for the natural gas"); *In re Borden*, 336 B.R. at 221 (the forward contracts at issue contemplated "a specified quantity of natural gas . . . at a fixed price"). Where *The Wall Street Journal* has used the term "forward agreement" and provided details of the transaction, it has always described fixed quantities and prices: "35 million shares," "$250,000 of marks," and "$1 million of bonds."[4] Non-bankruptcy case law

---

[4]Respectively, *Business Brief — Baxter International Inc.: Medical-Devices Company to Settle Forward Agreements*, Wall St. J., Nov. 13, 2002; Steven E. Levingston, *Chicago Merc Begins Trade of Currency 'Forwards'*, Wall St. J., Sept. 15, 1994, at C1; Randall Smith & Steven Lipin, *Beleaguered Giant: As Derivatives Losses Rise, Industry Fights To Avert Regulation — Stigma Has Already Stalled 'Exotic' End of Business, Where Most of Profit Is — Now a $35 Trillion Market*, Wall St. J., Aug. 25, 1994, at Al.

also accords the same meaning to "forward agreement." *Donoghue*, 2006 WL 775122, at \*1 (involving quantity of 300,000 shares of stock). These requirements are confirmed by the common meaning given to a "forward contract" as "a privately negotiated investment contract in which a buyer commits to purchase something (as a quantity of a commodity, security, or currency) at a predetermined price on a set future date." *Merriam-Webster's Dictionary of Law* (contract), *available at* http://dictionary.reference.com/browse/contract (last visited Jan. 16, 2009).

Finally, while the broad class of "swap agreements" includes contracts that are readily assignable and therefore tradable, "swap agreements" also include forward contracts, which are not necessarily assignable. The Chicago Mercantile Exchange's online glossary's definition states that "[i]n contrast to *futures* contracts, *forward* contracts are not standardized and not transferable." *CME Glossary of Terms*, http://www.cme.com/glossary/F.html (last visited Jan. 16, 2009) (emphasis added).

It is undoubtedly true that Congress sought in BAPCPA to effect greater protections of financial markets from the disrupting effects of bankruptcy and therefore to require a relationship between a commodity forward agreement and the financial markets. But this relationship need not be defined by trading in a market or on an exchange, as we have shown. *See, e.g.*, *Nagel*, 217 F.3d at 438-39 (describing how nonassignable contracts can easily become tied into the broader financial market when one party turns around and passes along some of its price-volatility risks to a third party via another contract).

Thus, insofar as our holding precludes the bankruptcy court from requiring, in defining a "commodity forward agreement," that the contract be traded in a market or on an exchange or that it not involve physical delivery of the commodity, our holding does not define that instrument or hold

that the contracts in this case are commodity forward agreements. We leave that to further legal and factual development on remand.

*REVERSED AND REMANDED*