In re CLEAR PEAK ENERGY, INC.,
a Nevada Corporation, Debtor.

Clear Peak Energy, Inc., a Nevada
corporation, Movant,

v.

Southern California Edison Company,
a California corporation,
Respondent.

No. 2:12–BK–03225–SSC.

United States Bankruptcy Court,
D. Arizona.

Feb. 26, 2013.

MEMORANDUM DECISION RE: WHETHER A RENEWABLE POWER PURCHASE AND SALE AGREEMENT IS A FORWARD CONTRACT UNDER 11 U.S.C. § 362(b)(6)

SARAH SHARER CURLEY, Bankruptcy Judge.

## I. INTRODUCTION

This matter comes before the Court on the Motion of Clear Peak Energy, Inc., the

Debtor ("Clear Peak" or "Debtor"), to Determine the Applicability of the Automatic Stay ("Motion") dated July 6, 2012.[1] Southern California Edison ("SCE"), a creditor, filed its Preliminary Objection to the Motion on July 12, 2012.[2] On August 16, 2012, the Debtor filed a Supplemental Motion and Declaration of Eric Anderson in support of its position that the automatic stay applied to its contract with SCE. Mr. Anderson also filed a Supplemental Declaration on August 16, 2012. On August 23, the Court executed an order allowing the Debtor to file certain documents under seal, including the Purchase Power and Sale Agreement between the Debtor and SCE. SCE filed its Supplemental Objection, as well as Declarations from Marc Chazaud and Nicole Neeman Brady, on August 31, 2012. Subsequently, on September 5, 2012, the Debtor filed a Reply.

The Court conducted its first hearing on the Motion on September 13, 2012, and determined that it needed more information. The Court directed SCE to file an additional declaration and the Debtor to file a response thereto. Thereafter, on October 1, 2012, SCE submitted the Supplemental Declaration of David R. Cox, which described the renewable energy market and SCE's operations in procuring renewable energy. Debtor filed its Reply to the Supplemental Declaration on October 9, 2012. The Court held a continued hearing on the Motion on October 31, 2012, at which David R. Cox, the Manager of Contract Administration in the Renewable and Alternative Power Department of

SCE, testified.[3] Other than the Declarations from Eric Anderson, the Debtor presented no further evidence in support of its position. At the conclusion of the hearing, the Court required further information from SCE. On November 6, 2012, SCE filed the Supplemental Declaration of Mr. Cox. Thereafter, the Court deemed the matter under advisement.

In this Memorandum Decision, the Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The issues addressed herein constitute a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 1334(b) and 157(b) (West 2012).

## II. FACTUAL BACKGROUND

The Parties are in substantial agreement as to the underlying facts of this case. On February 22, 2012, Clear Peak filed its voluntary petition under Chapter 11 of the Bankruptcy Code and is a Debtor-in-Possession in this case.

On November 15, 2010, Clear Peak and SCE entered into the written agreement entitled "Renewable Power Purchase and Sale Agreement" ("PPA"). The purpose of the PPA is clearly set forth in the opening recitals of the agreement:

> [Clear Peak] is willing to construct, own, and Operate a Generating Facility which qualifies as of the Effective Date as an [Eligible Renewable Energy Resource], and to sell the Product to SCE pursuant to the terms and conditions set forth in this Agreement; and

1. All references in this decision are to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, as amended, Pub.L. 109–8, 119 Stat 23 (2005) ("BAPCPA"), unless otherwise indicated.

2. Given the unique nature of the agreement entered into between the parties, SCE and the

Debtor agreed that the usual expedited nature of the proceedings concerning relief from the automatic stay would not apply to their dispute.

3. The transcript of the vast majority of this hearing was filed under seal.

SCE is willing to purchase the Product from Seller pursuant to the terms and conditions set forth in this Agreement. (PPA Recitals.)[4]

The "Generating Facility" described in the PPA is a Solar Photovoltaic facility with a capacity of 8.5 Megawatts.[5] The parties specifically agreed that Clear Peak would be the owner of the "Generating Facility" under the PPA. The term "Product"—which does not include the Generating Facility itself—is defined as "[a]ll electric energy produced by the Generating Facility throughout the Delivery Term, net of Station Use; all Green Attributes; all Capacity Attributes, if applicable; and all Resource Adequacy Benefits, if applicable; generated by, associated with or attributable to the Generating Facility throughout the Delivery Term."[6] The PPA sets forth the 20–year term of the Agreement[7] that commences after the Commercial Operation Date of the Generating Facility.[8] The PPA also provides a Commercial Opera-

tion Deadline by which date the Debtor must be operating the Facility. That Deadline is 36 months after approval of the PPA by the California Public Utilities Commission ("CPUC").[9] The Debtor may be granted an extension of the Deadline, if the Debtor pays liquidated damages.[10] Section 1.07 of the PPA fixes the Product Price during the term, with an escalator clause for each year of the Agreement.[11]

Certain provisions of the PPA grant a security interest to SCE in certain assets of Clear Peak. For instance, the PPA requires that the Debtor post certain cash or cash equivalents, such as a Performance Assurance Amount[12] and Development Security,[13] to ensure that the Debtor is able to perform under the PPA. The Debtor also grants SCE a first-priority security interest and lien on the Development Security, the Performance Assurance, and any other cash posted by the Debtor pursuant to Sections 3.06 and 8.02 of the PPA. The Debtor was also required to take the

4. Declaration of Eric Anderson, Docket Entry No. 62; Exhibit E (the PPA), Recitals at p. 1. (Exhibit E was filed under seal).

5. *Id.* at Exhibit A (Definitions) to Exhibit E (the PPA), Section 1.01(h) at p. 1. Section 111 states "Generating Facility means [Clear Peak's] electric generating facility as more particularly described in Exhibit B [to the PPA], ... excluding the Site, land rights, and interests in land."

6. *Id.* at Exhibit A to Exhibit E, Section 1.01(d) at p. 1.

7. *Id.* at Exhibit E, Section 1.06 at p. 4.

8. *Id.* at Exhibit E, Section 2.03 at p. 8. The term of the Agreement commences on the Commercial Operation Date, as set forth in Section 1.03 of the PPA. The forecasted Commercial Operation Date is December 31, 2013. The Commercial Operation Date may be extended; however, the outside date is no later than the earlier of (i) 120 days from the Initial Synchronization Date, and (ii) 36

months from the date of California Public Utilities Commission approval. The PPA was approved by the Commission on December 15, 2011, pursuant to Resolution E–445. *See* Exhibit 8 to the Supplemental Declaration of David R. Cox, dated October 1, 2012, Docket Entry No. 76. The Development Security was posted thereafter by Clear Peak, creating an CPUC approval date of January 14, 2012. See Debtor's original Motion, Docket Entry No. 43.

9. *Id.* at Exhibit E, Section 1.04(a) at p. 3.

10. *Id.* at Exhibit E, Section 3.06(c) at p. 17.

11. *Id.* at Exhibit E, Section 1.07 at p. 4.

12. *Id.* at Exhibit E, Section 1.08 at p. 4, which requires that the Debtor post a Performance Assurance Amount on a yearly basis, not less than $1,000,000 for 20 years.

13. *Id.* at Exhibit E, Section 3.06(b)(i) at p. 17, which states that the Debtor shall post one-half of the Development within 30 days of the

requisite action to perfect SCE's security interest in the posted cash and cash equivalents.[14] The PPA permits SCE to liquidate the Development Security or Performance Amount if there is an event of default.[15] In the PPA, the Debtor also agrees to certain collateral covenants to ensure that SCE's security interest is valid and enforceable.[16] The PPA does contemplate that the Debtor will assign the PPA to obtain financing for the construction and operation of the Generating Facility.[17] The Debtor also agrees not to "create, incur, assume, or suffer" any type of lien of a subcontractor, employee, or laborer of the Debtor's interest in the PPA, except for a lien that the Debtor may grant to a lender that finances the construction of the solar facility.[18] The PPA contemplates that if the Debtor files a bankruptcy petition and if the lender financing the construction of the facility takes possession of, or title to, the Generating Facility, the lender must cause its designee to enter into a similar PPA.[19]

Pursuant to the PPA, including Section 3.06, "Development Security," subsection (b), "Posting Requirements," Debtor is required to post and maintain a development fee equal to $60 for each kilowatt of contract capacity, with one-half of the Development Security due within 30 days following the effective date of the subject written agreement, and the remainder due to be posted within 30 days after the CPUC's approval has been obtained or the requirement has been waived by SCE.

Section 6 of the PPA defines Events of Default, as *inter alia,* either the Debtor or SCE filing a bankruptcy petition.[20] Another Event of Default is the failure of Clear Peak to post and maintain the Development Security pursuant to Section 3.06(a) (the amount to be posted) and Section 3.06(b), the timing of the posting of the Security.[21]

Debtor timely paid the sum of $255,000, constituting one-half of the required payment of the Development Security. On January 14, 2012, the CPUC issued its approval as called for pursuant to the terms of the subject written agreement. Under Section 3.06, "Development Security," Clear Peak, as Seller, was to post the remainder of the Development Security by on or about February 13, 2012. It did not post the balance of the Development Security by that date.

On February 14, 2012, SCE provided Debtor with a Notice of Event of Default, citing its failure to post the remainder of the Development Security. Pursuant to the terms of the subject written agreement, Debtor had until on or about February 22, 2012, to cure the Event of Default as cited in the Notice of Event to Default. The Debtor filed its voluntary Chapter 11 petition that day.

On February 29, 2012, SCE provided Debtor a notice which acknowledged the bankruptcy filing, and contended Debtor was in default (1) for its failure to pay the remainder of the Development Security as alleged above and (2) for filing its bank-

Effective Date of the PPA, with the remainder to be posted 30 days after CPUC approval.

14. *Id.* at Exhibit E, Section 8.03 at p. 53.

15. *Id.*

16. *Id.* at Exhibit E, Section 8.04 at p. 54.

17. *Id.* at Exhibit E, Section 10.05 at p. 61.

18. *Id.* at Exhibit E, Section 8.04(d) at p. 54 and Exhibit A (Definitions).

19. *Id.* at Exhibit E, Section 10.05(h) at p. 63.

20. *Id.* at Exhibit E, Section 6.01(a)(iv) at p. 43.

21. *Id.* at Exhibit E, Section 3.06, Subsections (a) and (b) at p. 17.

ruptcy petition which, under Section 6.01(a)(iv) of the PPA, was defined as an Event of Default.[22]

On April 2, 2012, Clear Peak entered into a Letter of Intent and Agreement with Recurrent Energy, LLC ("Recurrent"). The parties have not yet bound themselves to an asset sale agreement, but have reached an outline of the terms of sale, including the price to be paid subject to Recurrent's due diligence. Recurrent has made a cash payment to SCE to retain Clear Peak's interconnection application number that will allow Clear Peak to be in compliance with the current projected Commercial Operation Date of December 31, 2013. This sale cannot proceed if the Court determines that the PPA is a forward contract not subject to the automatic stay and, therefore, properly terminated by SCE.

As previously noted, this Court conducted an evidentiary hearing to determine the nature of the contract entered into between the parties. Of concern to the Court was whether the applicable California or federal regulations dictated what terms must be placed in the forward contract. Mr. Cox provided documentation with his declaration that the CPUC expected compliance with California law even if a utility believed that the available renewable resources were not "an ideal match with [the utility's] own projected needs."[23] CPUC developed "least cost" and "best fit" as separate, but interrelated, concepts to analyze the contracts that might be presented by merchants ("sellers") to a utility through the public solici-

tation process. In an opinion, the CPUC stated "while least cost [could] be looked at in a relatively universal manner ... best fit [was] inextricably linked to the needs of a particular utility."[24] Consistent with California law, CPUC required that each utility file, on an annual basis, a procurement plan that was consistent with the overall concepts.[25] Thus, Mr. Cox, on behalf of SCE, testified that a paramount regulatory obligation in California was for SCE to deliver power at the best price or "least cost to its customers."[26]

SCE developed a "least cost, best fit" methodology to evaluate the various contracts received through the public solicitation process. The methodology did afford SCE some flexibility. SCE, for instance, evaluated the power and natural gas price forecasts, its current portfolio, and its future capacity forecasts. Ultimately, SCE created a base portfolio that it updated with market prices, load forecasts, and recent procurement activities, to evaluate its hourly production costs of its base resource portfolio. Each contract proposal was then evaluated on its effect to the costs of the base portfolio. SCE's focus was to provide the requisite power or capacity at the cheapest possible price to its customers. Thus, SCE's portfolio was changed or modified as market conditions dictated.

SCE generally undertook three main steps in the solicitation process: (1) the initial data gathering and validation, (2) a quantitative assessment of the proposals, and (3) certain adjustments to a selection based on a proposal's qualitative attrib-

22. *Id.* at Exhibit C.

23. Supplemental Declaration of Mr. Cox, dated October 1, 2012, Docket Entry No. 76, Exhibit 5 at p. 28.

24. *Id.*

25. *Id.* at p. 30.

26. Docket Entry No. 84, October 31, 2012 Transcript at pp. 35–38. The majority of the transcript is under seal, so the pages set forth are not visible on the Court's electronic docket.

utes.[27] Once SCE received the proposals through the bid process, it reviewed them initially for completeness and conformity with the solicitation protocol. Sellers that bid, such as the Debtor, were allowed a cure period to remedy any deficiencies in the bid process. SCE also reviewed the bids to determine the reasonableness of the proposal parameters, such as capacity factors. SCE worked directly with the sellers to resolve this issue. SCE next performed a "quantitative assessment of each proposal" and ranked each proposal on its benefit and cost relationship. The total benefits and costs were used to calculate "the net levelized cost or 'renewable premium'." [28] Thus, "[b]enefits were] comprised of separate capacity and energy components, while costs included contract payments, integrations costs, transmission costs, and debt equivalence." [29] After the quantitative assessment of each proposal, SCE merit-order ranked all complete and conforming proposals into a preliminary short list. Finally, SCE performed an in-depth qualitative analysis to determine a proposal's attributes, such as technology, development milestones for the proposal, seller concentration, project size, and portfolio fit of commercial on-line data. Once the process was completed, SCE eliminated proposals or placed them on the short list for final approval.[30]

In the January 31, 2011 letter to CPUC, SCE identified the Clear Peak proposal, and stated that the Debtor would "develop and operate [a] clean solar electric power plant" with "proven lower-cost, [photovoltaic] technology." [31] Specifically, SCE focused on the Debtor's use of "a global leader of technical, project, operational support services and comprehensive services to the power industry [to assist the Debtor] in all aspects of the renewable project execution." [32]

SCE ultimately created a portfolio of renewable and conventional contracts with the expectation of meeting the goal of having 20 percent of its power from renewable energy as soon as possible. Specifically, as of January 31, 2011, the twenty Renewable Standards Contracts Program ("RSC Program") contracts entered into by SCE satisfied SCE's need for renewable energy with a total capacity of 239 MW over a 20-year term.[33] The Debtor's PPA was one of the contracts included in said analysis.

Based on the aforesaid facts, the Debtor contends SCE's actions to recover the Development Security and terminate the PPA with the Debtor violated the automatic stay in effect upon the filing of the Chapter 11 Petition. The Debtor asserts that the PPA is not a forward contract or, in the alternative, that those elements which require the posting of the Development Security are separate and distinct from the forward contract.

---

**27.** Declaration of Eric Anderson, Docket Entry No. 62, Exhibit F, January 31, 2011 SCE letter to CPUC, Section C at p. 16 (Exhibit F was filed under seal). This methodology is consistent with the Order Initiating Implementation of the Senate Bill 1078, CA Public Utilities Commission, filed October 25, 2001. Supplemental Declaration of Mr. Cox, October 1, 2012, Docket Entry No. 76, Exhibit 5 at 28–39.

**28.** Declaration of Eric Anderson, Docket Entry No. 62, Exhibit F, January 31, 2011 SCE letter to CPUC, Section C at p. 16.

**29.** *Id.*

**30.** *Id.* at pp. 16–17.

**31.** *Id.* at Exhibit F, January 31, 2011 SCE letter to CPUC at p. 21.

**32.** *Id.*

**33.** *Id.* at Exhibit F, January 31, 2011 SCE letter to CPUC, Part 3 at p. 13.

SCE argues that the PPA is a forward contract as to which the automatic stay does not apply pursuant to 11 U.S.C. § 362(b)(6) and that the PPA terminated, effective March 8, 2012, allowing SCE to retain the Development Security of $255,000 posted pre-petition and vitiating the Debtor's efforts to sell its rights under the PPA.

## III. ISSUE

The sole issue to be determined by this Court is whether the PPA entered into between Debtor and SCE is a "forward contract" that is not subject to the provisions of the automatic stay pursuant to 11 U.S.C. § 362(b)(6).

## IV. DISCUSSION

There are no Ninth Circuit decisions directly on point. Moreover, there are certain unique issues presented by this PPA that have not been considered in prior decisions from other United States Circuit Courts of Appeal. As a starting point, we consider the Bankruptcy Code, and what types of transactions are not subject to the automatic stay. If a party is within one of the exceptions, the party may proceed with its rights and remedies under applicable law, and need not seek an order from the bankruptcy court modifying, terminating, or annulling the automatic stay. The relevant section identified by the parties, and to be interpreted by the Court, is Section 362(b)(6), which provides, in pertinent part:

The filing of a petition.... does not operate as stay—

(6) under subsection (a) of this section, of the exercise by a ... forward contract merchant ... of any contractual right (as defined in section ... 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any ... forward contract or securities contract, or of any contractual right (as defined in section ... 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts ..."[34]

The Subsection relies on, and refers to, a forward contract which is a separately defined term. Second, a forward contract merchant must be involved in the transaction. Third, certain types of agreements, such as security agreements, may be within the protection or parameters of Section 362(b)(6) so long as they are "part of or related to any type of contractual right" under Bankruptcy Code Section 556. Finally, the relief afforded the forward contract merchant is to offset or net out "any termination value," "payment amount," or "other transfer obligation." However, the actual right to liquidate, terminate, or accelerate a forward contract, and not be in violation of the automatic stay, is contained within a separate provision of the Bankruptcy Code; namely, Section 556.

### A. *What is a Forward Contract?*

Section 101(25) defines a "forward contract" as

(A) a contract (other than a commodity contract as defined in section 761) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future become the subject of dealing in the forward contract trade,..... with a maturity date more than two days after the date the contract is entered into, including, but not

---

**34.** 11 U.S.C. § 362(b)(6)(West 2012).

limited to, a ... hedge transaction, loan, ... or any other similar agreement ...

Both parties rely on the Fourth Circuit decision of *In re National Gas Distributors,* 556 F.3d 247 (4th Cir.2009), to define what constitutes a forward contract. In *National Gas,* the debtor was a supplier of natural gas to its customers. The debtor entered into contracts with its customers that allowed the customers to create a hedge against fluctuations in the price that they had to pay for the commodity. The contracts provided that natural gas prices would be fixed during specified time periods. The debtor was also required to perform more than two days after the contracts' formation. The debtor did sell and deliver gas to its customers, and the customers did purchase and receive the natural gas at a specified price, or the difference between the market price and the agreed upon price in the contract.

In the *National Gas* case, the bankruptcy trustee pursued the customers, arguing that the below-market prices that they obtained were fraudulent transfers. The customers, relying on the 2005 amendments to the Bankruptcy Code, stated that they had entered into swap agreements with the debtor, that they were swap participants, and that the benefits that they had received were not avoidable as fraudulent transfers. *See* 11 U.S.C. §§ 548(d)(2)(D), 546(g), and 101(53B)(West 2012). In essence, the customers argued that they were entitled to the safe harbor provisions of BAPCPA and that their transactions with the debtor could not be avoided. Of importance to this Court is the analysis by the Fourth Circuit as to the nature and scope of a forward contract.

First, although the bankruptcy court had initially determined that the customers' contracts must be traded on the financial markets or exchanges to be within the safe harbor protections of BAPCPA, the Fourth Circuit disagreed. The Circuit stated that Section 101(25)(A) defined a forward contract as something other than a "commodity contract under section 761." In reviewing Section 761, the Fourth Circuit concluded that only a commodity traded on the exchange or the board of trade was included in the definition. Thus, since the definition of forward contract excluded such a commodity contract, a forward contract must be some other type of contract entitled to the safe harbor provisions of the Bankruptcy Code that was not traded on the markets or exchanges. The Fourth Circuit also stated that forward contracts may be directly negotiated between the parties, relying on *In re Olympic Natural Gas Co.,* 294 F.3d 737, 741 (5th Cir.2002). *See National Gas,* 556 F.3d at 257. SCE and the Debtor in this matter are in agreement that the PPA is not a commodity contract under Section 761 and that they could directly negotiate the terms of the PPA between themselves.

■ The Fourth Circuit ultimately developed a four-part test to determine whether a contract is a forward contract. *National Gas,* 556 F.3d at 259. The elements are as follows:

1. The Subject of The Contract Must be a Commodity with Substantially All of the Expected Costs of Performance Attributable to the Expected Costs of the Underlying Commodity

2. The Contract Must Have a Maturity Date more than Two Days After the Contracting Date

3. The Quantity and Time Elements Must be Fixed at the Time of Contracting

4. The Contract Must have a Relation-

ship to the Financial Markets.[35]

### 1. The Subject of the Contract Must Be a Commodity.

Under the first prong, the Fourth Circuit held that a court must differentiate between a forward contract, where costs were associated with hedging against price fluctuations, versus a supply contract, where costs were attributable to other factors, such as packaging, marketing, transportation, service, and similar matters that contribute to a greater portion of the costs. In making this determination, the Circuit concluded that "substantially all of the expected costs of performance must be attributable to the expected costs of the underlying commodity, determined at the time of contracting." *National Gas*, 556 F.3d at 259.

The Debtor argues that the construction of the facility in this case accounts for a substantial amount of the expected costs under the contract. The construction of the facility is projected to cost about $30 million, whereas annual costs to produce the power are only estimated to be $200,000. According to the Debtor, the construction costs constitute a factor which is substantial and not related to the expected costs of providing a commodity under the PPA. Thus, while electricity may be a commodity, the Debtor argues that the PPA attributes most of the cost to construction of a solar facility.

As evidenced in the pleadings and the transcripts from the hearings, Debtor's counsel has focused most of its argument on this one point. The existing case law regarding forward contracts is sparse enough, and there are no cases that address a contract that requires a party to construct the generating facility first. In the cited cases, including *National Gas*, the facility already existed and the party simply provided power. The court must ultimately decide whether the construction of the facility is "attributable to the expected costs of the underlying commodity" or whether it is another cost more akin to packaging, marketing, or transportation.

SCE has persuaded this Court that the regulatory environment and SCE's methodology to be in compliance with said environment dictate that the construction costs of the Debtor's solar facility be attributable to the anticipated costs of the underlying commodity. SCE has structured a base portfolio that it reviews on an annual basis to ensure that it is providing power to its customers at the least possible cost. That base portfolio is modified, as necessary, to provide energy to its customers through renewable energy resources. The portfolio is a complex mechanism to hedge against the increase of power costs to SCE's customers, both on a short-term and long-term basis.

However, given the new technology in the renewable energy area, there are few facilities that currently exist that are able to provide renewable energy at a low cost over a long term. Mr. Cox testified that as a result, the renewable energy projects needed to be analyzed in a different way. Although the initial construction costs for

---

**35.** The Fifth Circuit has adopted a four-part test as well, with two nuances: the contract must be executed by a forward contract merchant, and the contract must not be subject to the rules of a contract board of trade. *In re MBS Mgmt. Services, Inc.*, 432 B.R. 570 (Bankr.E.D.La.2010), *aff'd In re MBS Mgmt. Services, Inc.*, 690 F.3d 352 (5th Cir.2012). However, Section 362(b)(6) requires that at least one of the parties be a forward contract merchant, so the Court will separately consider that issue in this decision. As to whether the contract must be traded on the exchanges or the board of trade, the Fourth Circuit addresses that issue as a preliminary matter as has this Court. Therefore, the Court will focus its analysis on the *National Gas* decision.

the renewable energy facility might be somewhat higher than the costs associated with the generation of power from another type of facility, the costs to provide power to the SCE's customers, when considered over the long term, were consistent with the costs to provide power with other types of power contracts from other types of facilities. It was these ultimate long-term costs that SCE considered in determining whether any project was "in the money;" that is, SCE could provide renewable power, over the long term, to its customers that was at a cost less than, or consistent with, other energy contracts in SCE's portfolio. Mr. Cox stated that the Debtor's PPA was initially "in the money" and an appropriate contract for SCE to include in its portfolio to meet its regulatory long-term requirements in providing renewable energy. However, as of the October 31, 2012 hearing, there was a question as to whether the Debtor's PPA was still appropriate for SCE's portfolio.

The Court concludes that electricity, as a commodity, is the subject of the PPA in this matter, and that substantially all of the expected costs of performance, when considered over the 20–year term of the PPA, are consistent with the expected costs of the commodity over the same period of time.

### 2. The Contract Must Have a Maturity Date More than Two Days after the Date of Contracting.

■ The courts that have analyzed "maturity date" under Section 101(25) have come to different conclusions about the meaning of the term. *In re Cascade Grain Products, LLC*, 465 B.R. 570, 573 (Bankr.D.Or.2011). A Ninth Circuit bankruptcy court concluded that "maturity date" means the "future date at which the commodity must be bought or sold." *Id.* at 575. The Fifth Circuit recognized that

"although courts may have been uncertain about the meaning of 'maturity date' as used in [Section 101(25)], none suggest that contracts that do not specify a maturity date do not have one." *In re MBS Mgmt. Services, Inc.*, 690 F.3d 352, 356 (5th Cir.2012).

The Fifth Circuit's analysis seems especially apt here. The PPA between the Debtor and SCE admittedly does not have a specific date at which it will supply power and when payment for that power will be due. The PPA does, however, set forth a timeline based on the project gaining regulatory approval and allowing for possible extensions of time by the Debtor. The Commercial Operation Deadline has been set for 36 months after the date of the approval of the PPA by CPUC (PPA § 1.04(a)), plus up to an additional 180–day extension of the Commercial Operation Deadline, if Debtor pays liquidated damages (PPA § 3.06(c)). Eventually, however, given the 20–year term of the PPA, the contract will mature beyond the 2 days required.

The Court concludes that this forward contract factor has been satisfied.

### 3. The Quantity and Time Elements Must be Fixed at the Time of Contracting.

■ There does not seem to be much of a dispute as to this issue, though SCE notes that the Fifth Circuit has distinguished its decision from that of the Fourth Circuit by holding that a requirements contract that does not have a specific quantity satisfies this element, since the reference in the Fourth Circuit decision to "fixed" quantity and time elements is meant to be "evocative rather than prescriptive." *MBS Mgmt. Services*, 690 F.3d at 356 (referring to *National Gas* ). In any event, the PPA in this matter does specify the Product Price, with an escala-

tor clause, over the 20–year term. In turn, the Product Price anticipates that the Facility will generate a certain minimum quantity of power over a specific period of time. Indeed Mr. Cox testified that SCE considers the quantity of renewable energy to be provided over a specific period of time as an important part of its hedging analysis at the time of contracting and, thus, important in determining which contracts should be presented to CPUC for its final approval.

The Court concludes this element has been met.

### 4. The Contract Must Have a Relationship to the Financial Markets.

■ Both the Fourth and Fifth Circuits recognized that the forward contract must have a relationship to the financial markets, though forward contracts are not transferable or traded on an exchange. *National Gas,* 556 F.3d at 260; *MBS Mgmt. Services,* 690 F.3d at 357. The courts have concluded that "ordinary supply contracts" should not receive the special protections given to forward contracts. *MBS Mgmt. Services,* 690 F.3d at 356; *In re Borden Chemicals,* 336 B.R. 214, 220 (Bankr.D.Del.2006) (quoting H.R. REP No. 101–484, at 6 (1990), 1990 U.S.C.C.A.N. 223). This conclusion is based on Congressional recognition that the marketplace is creative and that instruments may be designed to fit the needs of the moment. Thus, Congress declined to describe, in detail, the elements of transactions it sought to exempt from the effects of bankruptcy. *National Gas,* 556 F.3d at 259. Instead, Congress generally sought to protect financial markets from instability that bankruptcy proceedings might cause. *Id.* Therefore, this Court has some discretion in determining whether the PPA, in this case, is deserving

of the special protections reserved for forward contracts.

■ The parties emphasize two different purposes behind the PPA: promoting renewable energy and price hedging. Other courts that have determined whether a contract is a forward contract have similarly considered contracts with dual purposes. In *MBS Mgmt. Services,* the bankruptcy court stated the following:

Admittedly, even supply contracts have hedging or risk management attributes. By setting the price for electrical power, end users protect themselves against large fluctuations in price and stabilize their cost of power. As a result, Trustee must refine his position to admit that while the Contract contains hedging attributes, because those were not MBS' primary goal, it is not a forward contract.

*MBS Mgmt. Services,* 432 B.R. 570, 576–77 (Bankr.E.D.La.2010).

In *Borden,* the court commented that "the House Report provides that [t]he primary purpose of a forward contract is to hedge against possible fluctuations in the price of a commodity. This purpose is financial and risk-shifting in nature, as opposed to the primary purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the commodity." *In re Borden Chemicals,* 336 B.R. 214, 220 (Bankr.D.Del.2006) (quoting H.R. REP No. 101–484, at 4 (1990), 1990 U.S.C.C.A.N. 223).

In this case, the Debtor contends that the primary purpose of the PPA is to provide renewable energy to allow SCE to meet its renewable energy mandate. California has mandated that 33% of the State's energy must be from renewable sources by 2020, and the Debtor argues this project is simply a matter of SCE meeting that quota. Debtor points to the CPUC Decisions that apparently only re-

quire four non-modifiable terms in the forms utilized for Renewable Energy PPAs. Also, the Exhibits provided by SCE reveal that the CPUC gave the utility companies, including SCE, a wide berth in drafting the Renewable Energy PPAs. The Debtor states that no regulatory agency has mandated that the utilities use forward contracts or hedging in acquiring renewable energy. Securing a PPA and then obtaining regulatory approval also has the benefit of allowing the power provider, the Debtor here, to obtain financing and investment for the project—a purpose beyond the scope of hedging.

SCE argues that the PPA with the Debtor is part of a broader price-hedging scheme. The Declarations of Ms. Brady and Mr. Cox, as well as Mr. Cox's testimony, reflect that SCE acquires 98% of its power through short- and long-term PPAs with both renewable and conventional resources. SCE's "open position"—the amount of power that must be acquired on the spot market—fluctuates between 0 and 2 percent. Also, while it does not appear that utilities such as SCE are required to use forward contracts by the regulatory agencies, CPUC does have to approve all of the PPAs, and one of the factors it considers is the reasonableness of the price. Thus, an instrument such as a forward contract that locks in a certain price may be very important in obtaining regulatory approval.

The Court concludes, in this matter, that SCE has created a complex mechanism to evaluate the contracts that will supply power to its customers. SCE has a base portfolio that is analyzed, on an annual basis, to determine what the short- and long-term prices will be under its various PPA's. SCE adjusts its portfolio, as necessary, to ensure that it is providing power to its customers on a "least cost" basis. Although the PPA, as described, does include certain elements of a secured transaction and an executory contract to ensure that SCE is protected to the extent that one of its sellers, such as the Debtor, files a bankruptcy petition, the Court concludes that the primary purpose of the PPA herein is to allow SCE to hedge the price that it must pay for power over the long term.

## B. What is a Forward Contract Merchant?

■ Returning to Section 362(b)(6), the next term that must be defined is "forward contract merchant." Section 101(26) (West 2012) states that such a Merchant is "any entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in ... any similar good, article, service, right or interest which is presently or in the future becomes the subject of dealing in the forward contract trade." [36] The definition refers to the term, "merchant," which is not a defined term in the Bankruptcy Code. However, if we provide the term with its everyday, ordinary meaning, it refers to a "person whose business is buying and selling goods for a profit" or simply a "trader." *Webster's New College World Dictionary,* 4th Edition, Wiley Publishing, Inc. (2005). In the transaction between SCE and the Debtor, SCE would be the entity whose business is, in part, to enter into forward contracts. As previously discussed, SCE is a California utility that provides power to its customers, but as a part of that process, it enters into forward contracts to hedge against price fluctuations in the energy market. The Debtor does not contest that SCE is such a Mer-

**36.** As previously discussed, a commodity contract as defined in section 761 is not applicable to the contract between the Debtor and SCE, since the subject contract has not been traded on the exchanges or board of trade.

chant. Rather, the Debtor argues that it has been somehow coerced into acknowledging, in the PPA, that it too is a Forward Contract Merchant.[37]

First, there is nothing in the record to show any coercion by SCE. The evidence clearly reflects that SCE provided an open bidding process that allowed any entity to submit a bid for a renewable energy contract. As a part of the process, the parties were provided with the proposed contract to be entered into with SCE.[38] The Debtor could have requested that the provision be stricken or reworded, or the Debtor could have decided not to enter into the contract with SCE. The Debtor did neither.

■ Second, the Debtor arguably is a Forward Contract Merchant. The terms and conditions of the contract should control unless there is a legal basis to relieve the party of its contractual duties. *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir.2012); *In re Bush*, 356 B.R. 28 (Bankr.S.D.Cal.2006) (Under California law, if contract language is clear and explicit, it governs). The Debtor is a sophisticated party that presented its bid in an open bidding process. The Debtor is the seller or provider of the commodity, electricity, to SCE. Under Section 101(26), SCE and the Debtor entered into a contract for the sale of electricity for future delivery. Although such terms as "good," "right," or "interest" are not defined under the Bankruptcy Code, the focus of the Forward Contract Merchant definition is to determine whether the good, right, or interest is the "subject of dealing in the forward contract trade." "Forward contract trade" is not defined in the Bankruptcy Code either. However, if we turn to the everyday meaning of the word

"trade," we find that is a "customary course of action." *Webster's New College World Dictionary*, 4th Edition, Wiley Publishing, Inc. (2005). Thus, "forward contract trade" would be a customary course of action for forward contracts. Mr. Cox testified that SCE has created a base portfolio, for hedging purposes, which includes contracts with short- and long-term maturity dates that are not traded on the exchanges or the board of trade. The evidence reflects that SCE and other utilities enter into such contracts for the future delivery of electricity that are customary for the generation of power. Based upon the evidence, the Debtor is a Forward Contract Merchant.

Finally, even if the Debtor is not a Forward Contract Merchant, Section 101(26) only requires that one party to the contract be so designated. The only exception is if both parties to the contract are non-merchants. *In re Borden*, 336 B.R. 214, 225 (Bankr.D.Del.2006), (*citing* to 5 *Collier on Bankruptcy* § 556.03(2) at 556–6 (15th ed. Rev. 2001)). The Court concludes that at least one of the parties to the PPA, SCE, is clearly a Forward Contract Merchant. The Court concludes that this factor, under Section 362(b)(6), has been met.

### C. *Is the PPA a Contract Within the Parameters of Section 556?*

■ To determine whether Factor 3 pertaining to certain types of security agreements and whether they are within the protection of Section 362(b)(6), and Factor 4, whether SCE may exercise its rights of offset or setoff, apply to the facts in this matter, the Court must first decide

---

37. Declaration of Eric Anderson, Docket Entry No. 62; Exhibit E, Section 10.09(*o*) at p. 65.

38. Supplemental Declaration of David R. Cox, Docket Entry No. 83; Exhibit 1, which includes the terms and conditions of any proposed agreement.

whether the PPA is a forward contract subject to the provisions of Section 556. Section 556 states, in pertinent part:

> The contractual right of a ... forward contract merchant to cause the liquidation, termination, or acceleration of a ... forward contract because of a condition of the kind specified in section 365(e)(1) of this title ... shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title.[39]

The definition initially focuses on whether one of the conditions set forth in 11 U.S.C. § 365(e)(1) is applicable. Section 365(e)(1) specifically enumerates the commencement of a case under Title 11 of the United States Code; that is, the Bankruptcy Code. The PPA also provides, as stated hereinabove, that it is an event of default and the PPA may be terminated, if either SCE or the Debtor files a bankruptcy petition. In this matter, the Debtor commenced a case by voluntarily filing a chapter 11 petition. Thus, SCE may rely on (1) Section 556, and its reference to Section 365(e)(1) and the commencement of a bankruptcy case, and (2) the provision in the PPA designating the Debtor's filing of a bankruptcy petition as an event of default to terminate the PPA with the Debtor. Section 556 provides that SCE's termination of the PPA is not a violation of the automatic stay, and a bankruptcy court may not enter an order prohibiting SCE from proceeding with its rights and remedies under the PPA. In turn, the contractual provision in the PPA, creating an event of default with the Debtor's filing of a bankruptcy petition, allows SCE to ter-minate the PPA and proceed with its rights and remedies under the PPA.[40]

The Court concludes that the PPA is a forward contract within the parameters of Section 556, and SCE is permitted to proceed with the termination of the PPA as a result of the Debtor's filing of a bankruptcy petition which is an event of default under the PPA.

### D. Is the PPA within the Protection of Section 362(b)(6) even though it Grants SCE a Security Interest in Certain Property of the Debtor?

Security agreements may be within the protection of Section 362(b)(6), if they are "part of or related to any type of contractual right" under Bankruptcy Code Section 556. The Court has already determined that the PPA is a forward contract entered into by at least one forward contract merchant. The purpose of the PPA is to provide SCE with the ability to hedge and, hence, control the short- and long-term prices that will be charged to its customers. Although the PPA does provide that the Debtor shall grant SCE a perfected security interest in the Development Security and any other cash that the Debtor may provide to SCE, the security interest is incorporated into the PPA and is ancillary to the purpose of the PPA. The Debtor's granting of security interest to SCE is simply part of the bundle of rights accorded to SCE in the PPA. Since the PPA is a forward contract, the security interest granted to SCE in the same contract cannot be separated from the PPA. If an event of default were to occur, SCE and the Debtor contemplated that they would each be provided with a bundle of rights

---

**39.** 11 U.S.C. § 556 (West 2012).

**40.** It is possible that a forward contract merchant may not designate the filing of a bankruptcy petition as an event of default. If that happens, Section 556 would allow the forward contract merchant to proceed with only those rights and remedies designated in the contract.

and remedies in the PPA. The Court does not see a basis, as a matter of fact or law, to vitiate one remedy over another. Thus, since the PPA is now terminated, SCE may proceed with one or more remedies as provided under the PPA, and the exercise of those remedies will not be stayed or limited by this Court.

### E. *May SCE offset or Net Out Certain Payments or Obligations?*

█ Under Section 362(b)(6), a forward contract merchant may proceed with offsetting or netting out certain payments, if provided for under the forward contract. This Court has already concluded that the PPA is a forward contract, and that an event of default has occurred thereunder. The automatic stay does not prohibit SCE from terminating the PPA with the Debtor. As a part of that termination process, or to exercise a separate remedy under the PPA, SCE is entitled to set off against the Development Security that the Debtor has placed with SCE. Moreover, since the PPA may be terminated by SCE, there is no basis for the Debtor to proceed with an assignment of the PPA to Recurrent as envisioned by the Debtor.

### V. CONCLUSION

Based upon the foregoing, the Court concludes that the Renewable Power Purchase and Sale Agreement (the PPA) is a forward contract entitled to the protections of Section 362(b)(6). SCE was entitled to declare an event of default under the PPA once Clear Peak filed its bankruptcy petition. SCE is entitled to proceed with its rights and remedies under the PPA, a forward contract, including the ability of SCE to set off or net out the Development Security placed by the Debtor with SCE against any damages that SCE has incurred.

SCE is directed to upload an order consistent with the Court's Memorandum Decision.